No. 32,095

THE SOUTHWEST KANSAS OIL AND GAS COMPANY et al., *Appellees,* v. THE ARGUS PIPE LINE COMPANY et al., *Appellants.*

(39 P. 2d 906)

Opinion filed January 26, 1935.

*Robert C. Foulston, George Siefkin,* both of Wichita, *S. C. Bloss,* of Winfield, *H. J. Foster,* of Garden City, *George W. Burton* and *N. W. Behrens,* both of Chicago, Ill., for the appellants.

*J. A. McDermott, Richard B. McDermott,* both of Winfield, for appellee Southwest Kansas Oil and Gas Company; *W. L. Cunningham, Arthur D. Walker, Fred G. Leach* and *Wm. E. Cunningham,* all of Arkansas City, for appellee Stevens County Oil and Gas Company, and *G. J. Neuner,* of Kansas City, Mo., for appellee Texas Interstate Pipe Line Company.

The opinion of the court was delivered by

BURCH, J.: The action was one to compel performance of a gas-purchase contract, and to recover damages for nonperformance. Plaintiffs prevailed, and defendants appeal.

The district court made extended findings of fact, based on voluminous evidence, introduced in support of issues formed by pleadings, the framing of which consumes 88 pages of the abstract. The meritorious questions are just two, and are very simple. Was there a contract, and if so, was the contract against public policy? The court will make only a brief statement of the case, utilizing established facts, inferences from established facts, and conclusions of law indiscriminately, as may be necessary for purpose of condensation and abridgment.

W. N. McKnab and W. L. Sidwell went into wildcat territory and discovered a natural-gas field in Stevens county. Wells were very difficult to drill and very expensive. The discoverers began to market gas in a small way in the vicinity of the field, and began to look about for other markets. An engineer was employed, who made a survey to determine possibility of substantial marketing of gas from the field. Without an engineer's report, a glance at a map will show that the profitable markets accessible from the field were Dodge City and Garden City. There is a sugar factory just outside Garden City which would likely be, and in fact became, the largest consumer of natural gas in southwestern Kansas. Along pipe-line routes were small places which could be served, and there was a possibility pipe-line extensions might reach other markets. To supply city markets it would be necessary to obtain franchises, build pipe lines, and install distributing systems. To keep up production and maintain reserves new wells must be sunk, and existing leases must be kept alive. One not in the gas game can see that profitable gas business involves two reciprocal and mutually dependent branches, production and distribution. Large profits come from large production and large distribution, which require expenditure of large sums of money.

Sidwell obtained a franchise at Hugoton, in Stevens county, built a short pipe line, and put in a distributing system there. McKnab negotiated for a franchise at Dodge City, in Ford county, but consummation of the grant was delayed to see what the grantee would be able to do by way of assured production. About this time, with actual production small but potentially great, and actual distribution small but potentially great, A. J. Hardendorf appeared, and negotiated with McKnab and Sidwell, who lacked capital to carry on both branches of their business in a profitable way. The result

was separation of distribution from production by two contracts, whereby McKnab and Sidwell confined themselves to production, and Arthur K. Lee, trustee, became distributor. The first contract was dated December 29, 1928, and provided for the other contract, which was dated January 18, 1929.

Pursuant to the contracts, production and distribution began in earnest. The Dodge City franchise was consummated. A pipe line to Dodge City was completed, a distributing system was installed there, and towns along the pipe line were supplied with gas. In construction of the Dodge City pipe line, provision was made at Copeland Junction, the nearest point to Garden City, for connection of a pipe line to Garden City.

Other persons and companies in the gas business took notice, and a ruthless contest was on for the prizes, Garden City and the sugar factory. Ultimately a franchise was granted to the Garden City Gas Company. A pipe line was built connecting with the Dodge City pipe line, and by means of the two pipe lines, Garden City and the sugar factory were supplied with gas from the McKnab and Sidwell wells.

A corporation is a means to an end of great social value, but the corporate method of doing business may be overdone. In some instances, in recent times, it has become a social menace. In this instance, the simple McKnab and Sidwell—Lee, trustee, enterprise became involved in a corporate structure, the units of which were as plentiful as blackberries in season. The Lee, trustee, distributing interests, including benefits and burdens, passed to the Argus Pipe Line Company. The Argus Pipe Line Company is owned by the Northern Gas and Pipe Line Company, which is a tool of other corporations, involved in one way and another in a network of corporations having to do with production and distribution of gas extending from Texas to Minnesota.

In order to get a franchise in Garden City it was necessary that the grantee be a Kansas corporation. So the Garden City company was organized under Kansas law, with 5,000 shares of nonpar stock, but the shares were issued to the Northern Gas and Pipe Line Company. Abbreviating law and facts, the Argus Company and the Garden City Company constitute a single concern, under one management, for distribution of gas from the McKnab and Sidwell wells; pursuant to the contracts of December, 1928, and January, 1929.

The contracts were performed on both sides for a while, and then

the power which wiggles the tentacles of the corporate octupus which has been referred to, deliberately and arbitrarily discontinued taking gas from the McKnab and Sidwell field.

The McKnab and Sidwell interests passed to plaintiffs, the Southwest Kansas Oil and Gas Company, a corporation, the Stevens County Oil and Gas Company, a corporation, and the Texas Interstate Pipe Line Company, a corporation.

The initial contract between McKnab and Sidwell on one side and Lee, trustee, on the other, embraced several subjects. It provided for purchase by Lee, trustee, of the existing Hugoton franchise, pipe line and distributing system, and purchase by Lee, trustee, of the Dodge City franchise, if it became effective. Among still other provisions, the contract contained the following:

"6. It is further agreed that in event the franchises above referred to or either of them are conveyed, assigned and delivered to the party of the second part, then the party of the second part agrees to buy and the parties of the first part agree to sell, all gas produced from any and all of the gas wells developed by first parties or their assigns in the vicinity of their present holdings in Stevens county, Kan., up to the requirement of second party in serving the cities of Dodge City, Hugoton and all other towns and customers served by him or his assigns, up to the reasonable capacity of such wells on property now owned by first parties or hereafter acquired, the said first parties, however, to develop their property so as to produce, if possible, a minimum of ten million feet per day before completion of gas line to Dodge City.

"In the event of failure of first parties to so develop the properties held by them to meet the requirements of second party, and to maintain a production under test exceeding by sixty (60) per cent the peak load purchased by second party or his assigns, then the second party or his assigns shall have the right to enter on such property and drill additional wells, taking the costs of such wells out of the gas purchased, or the second party shall have the right to obtain additional gas from other sources, but without liability on the part of first parties.

"7. The second party or his assigns agree to pay to first parties or their assigns, a sum of money equal to eight cents per thousand cubic feet of gas distributed by second party for domestic consumption and six cents per thousand cubic feet of gas distributed by second party for industrial consumption, such gas to be measured at the well at 14.4 pounds atmospheric pressure, and the price at the well prorated on the basis of the percentage of gas distributed for each of such purposes.

"The term of such gas-purchase contract shall be for the term of the franchises held by second party, or the life of the field.

"8. A gas-purchase contract embodying these terms shall be executed by the parties hereto or their assigns in a separate instrument."

The gas-purchase contract provided for in the first contract fixed prices of gas sold and bought, fixed duration of the contract, con-

tained other provisions pertinent to a gas-purchase contract, and contained the following provisions, McKnab and Sidwell being parties of the first part and Lee, trustee, being party of the second part:

"Whereas, parties of the first part desire to sell and party of the second part desires to buy gas produced from any and all wells upon said above-described lands.

*"Now, therefore,* party of the second part agrees to buy and parties of the first part agree to sell all gas produced from any and all of the gas wells developed by first parties or their assigns upon their present holdings in Stevens county, Kansas, up to the requirements of second party in serving the cities of Dodge City, Hugoton and all other towns and customers served by him or his assigns up to the reasonable capacity of such wells on property now owned by first parties. First parties agree to sell and second party agrees to purchase and receive at the mouth of the well or wells heretofore mentioned, drilled and to be drilled, all merchantable gas in its natural state as produced necessary for the requirements of second party during the term of the present leasehold thereon or any renewal thereof, and as long as gas is produced from said well in paying quantities. . . . ."

The two instruments must be read together, and so considered they evidence the set of promises—that is, the contract—for breach of which remedy is invoked. Defendants contend the contract lacks mutuality, and is so indefinite as to be unenforceable.

McKnab and Sidwell sold to Lee, trustee, the franchise procured at Hugoton, the Hugoton pipe line and the Hugoton distributing system. The sellers also sold the Dodge City franchise *in fieri*, which became effective. With respect to those places, the contract to sell and to buy gas was manifestly definite for the usual term in all such cases.

"A promises B to sell to him and B promises A to buy of him all goods of a certain character which B shall need in his business during the ensuing year. There is a contract." (Restatement, Contracts, ¶ 32, Illustration 12.)

The contract also provided that the seller would sell and the buyer would buy all the seller's gas up to the requirements (need) of the buyer in serving all other towns and customers served by the buyer. Lee, trustee, was not then serving any town or customer, and this provision looked to the future. Defendants contend Lee, trustee, did not obligate himself to serve any other towns or customers.

The standard of interpretation of a contract when, as in this case, there is integration by adoption of writings as final and complete expression of agreement, is as follows:

"The standard of interpretation of an integration, except where it produces an ambiguous result, or is excluded by a rule of law establishing a definite

meaning, is the meaning that would be attached to the integration by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration, other than oral statements by the parties of what they intended it to mean." (Restatement, Contracts, § 230.)

"Correlative obligation sufficient to sustain specific performance may be implied from the situation of the parties and the circumstances surrounding the execution of the contract." (*Zelleken v. Lynch,* 80 Kan. 746, 748, 104 Pac. 563.)

"If the conduct of the parties subsequent to a manifestation of intention indicates that all the parties placed a particular interpretation upon it, that meaning is adopted if a reasonable person could attach it to the manifestation." (Restatement, Contracts, § 235 [e].)

Bearing in mind the principal apparent purpose of the parties is given great weight in determining the meaning to be given a contract (Restatement, Contracts, § 236 [b]), any reasonable person in possession of all the facts, excluding oral statements of intention by parties, would understand the contract in question to include prosecution of distribution beyond Hugoton and Dodge City, with accompanying expansion of production.

When the Argus Pipe Line Company acquired the rights and privileges and assumed the duties created by the contract, distribution had been extended to a dozen towns besides Hugoton and Dodge City, in four counties besides Stevens and Ford. The towns were or soon became "towns and customers served." Distribution, however, did not stop there. The master of the Argus and Garden City companies obtained the Garden City franchise, and the sugar factory as a customer, and supplied the city and the factory with gas from the McKnab and Sidwell wells. Any reasonable person could come to but one conclusion, namely, that the parties to the contract had interpreted it as meaning Lee, trustee, would continue to find markets which McKnab and Sidwell would supply.

The result is that by fair interpretation, verified by unequivocal conduct, the contract meant production and distribution would go hand in hand, after Hugoton and Dodge City were supplied, to include what was obviously the most desirable and desired market to be reached. Besides that, the promise of Lee, trustee, to buy gas up to his requirements in serving "all other towns and customers served by him," had been made perfectly definite and certain, and Garden City and the sugar factory had been brought within the terms of the contract.

In connection with the subject of mutuality, defendants refer to the decision in the case of *City of Holton v. Kansas' Power & Light Co.*, 135 Kan. 58, 9 P. 2d 675. The syllabus reads:

"In a contract between a producer of electric current and a city, the producer agreed it would furnish and sell to the city electric current sufficient for the wants of the city and its inhabitants for a period of years, and the city agreed it would purchase all the electric current used by it during the period from the producer. *Held,* the contract was not void for lack of mutuality."

Defendants distinguish the case on the ground an established business was involved. There is no reason in law why a person proposing to produce, but not yet owner of gas land or gas lease, may not enter into a contract with another proposing to distribute but without a foot of pipe, having the effect of the contract between McKnab and Sidwell, and Lee, trustee.

Having reached the Garden City and sugar-factory goals, and having enjoyed the benefits of the contract for a period of time, the defendants had a lapse to virtue. It would be against public policy to supply Garden City and the sugar factory with gas, pursuant to the contract. Incidentally, defendants could buy gas for five cents per 1,000 feet, and so materially increase profits on the Garden City and sugar-factory service.

As indicated at the beginning, the contract created what was virtually a joint enterprise, including the interdependent elements of production on one side and distribution on the other. The territory within which the contract could operate was not supplied with gas and had not been explored for gas. There was no intent or attempt to stifle competition or to create a monopoly in service to the territory. No competitor able to produce, or distribute, or both, was restrained from serving the territory, and service to that territory would distinctly and manifestly promote the public welfare.

Under the common law, a bargain between two persons, requiring them to deal exclusively with each other, is not in unreasonable restraint of trade, unless in connection with monopoly. (Restatement, Contracts, § 516 [e].)

We have in this state a monopoly and unfair-trade statute, R. S. 50-101, supplemented by, R. S. 16-112, which deals with the subject of contracts. They do not forbid exclusive sales of goods, wares or merchandise. (*McConkey v. Motor Co.*, 112 Kan. 560, 211 Pac. 631.) The statute, which fixes the public policy of this state, and which need not be reprinted here, may be checked, provision by pro-

vision, and the contract in question does not transgress any one of them.

Defendants contend the contract was void, because it fixed the price of gas for resale to the public. The contention is not well founded. The case of *Mills v. Ordnance Co.*, 113 Kan. 479, 215 Pac. 314, is cited, which illustrates the principle involved. In that case the contract of sale provided the purchaser should maintain the seller's published list prices. There is nothing of that kind in the contract under consideration, either expressed or implied. A bargain in restraint of trade is illegal, not if there is restraint, but if the restraint be unreasonable. (Restatement, Contracts, § 514.) Length of time restraint is to last, and territory over which it is to spread, are not conclusive (Restatement, Contracts, § 515, Comment *c.*), and in this instance clearly do not vitiate. Other features of the contract must be tested by the same rule of reason. (Restatement, Contracts, § 515, Comment *a.*)

No producer could go to the expense necessary to equip himself for large production, and then have the distributor say, "Cut your price in two or I will not take." No distributor could acquire franchises obligating him to serve, construct pipe lines and install distributing systems, and then have the producer say, "Pay double or I will not supply you." In this instance, price was a necessary element of the contract, and there is no suggestion the price was unreasonable when the contract was made, in view of the circumstances under which it was made. Customers may buy or refuse to buy at prices offered by the distributor, but the contract between producer and distributor does not become illegal.

Illustrating the fact the contract had no tendency to suppress competition, there were numerous applicants for the Garden City franchise. A franchise was tendered to supply gas at a certain rate. Rivals were obliged to meet the rate. The city imposed a condition that the successful applicant should be a Kansas corporation. Finally a franchise was granted. A sentiment had been created (who first aroused it may be surmised) that local production should be encouraged. The franchise contained no provision that would foster local production. A referendum was held, and the franchise was repudiated. Then there was demand that whatever franchise was granted should provide that all gas furnished the city should be from the locality, if enough were available. Finally a franchise was granted to the Garden City Gas Company, a domestic corpora-

tion, which fixed rates, and which contained a provision that at least fifty per cent of the gas supplied to the city should be from local sources.

The city was permitted to intervene, and contends that to enforce the contract would be to prevent the Garden City Company from responding to public sentiment and taking more local gas if it wanted to. Garden City, as a municipal corporation, has no interest, protected by law, other than that created by the franchise which it granted. There is no complaint of violation or abuse of the franchise, and the city has no standing to demand breach of a lawful contract of the gas company with its producer, to give the gas company a chance to be public spirited.

Plaintiffs had some wells connected with another distributing system, but there is no testimony the wells connected with the Argus system were also connected with the other system, or testimony showing feasibility of connection with and sale to the other system, until contract relations could be restored. The result is, what plaintiffs lost by breach of the contract was the quantity of gas defendants should have taken but did not take at the contract price.

The judgment of the district court is affirmed.

HUTCHISON, J., not sitting.