No. 36,945

BESSIE B. HECKARD, *Appellant,* v. LUCILE JEANNIE PARK, *Appellee.*

(188 P. 2d 926)

Opinion filed January 24, 1948.

*John F. Eberhardt,* of Wichita, argued the cause, *Robert C. Foulston, George Siefkin, George B. Powers, Samuel E. Bartlett, Andrew F. Schoeppel, Carl T. Smith, Stuart R. Carter* and *Thomas E. Woods,* all of Wichita, were with him on the briefs for the appellant.

*Austin M. Cowan,* of Wichita, argued the cause, and *W. A. Kahrs, Robert H. Nelson* and *Lloyd F. Cooper,* all of Wichita, were with him on the briefs for the appellee.

The opinion of the court was delivered by

WEDELL, J.: This was a suit for an accounting and for specific performance of a written contract. Plaintiff appeals from an order sustaining a general demurrer to her amended petition.

While there were three parties to the contract, the plaintiff, the defendant and her mother, the mother is not a party to the action. We shall continue to refer to the parties as plaintiff and defendant.

The original petition, in substance, alleged:

Plaintiff and defendant are residents of Sedgwick county; on October 3, 1941, they entered into a written contract marked exhibit "A"; defendant was then a minor and executed the contract personally and by and through her mother and legal guardian; thereafter on January 3, 1945, plaintiff and defendant entered into a second written agreement marked exhibit "B"; at that time defendant was and is now of age; exhibit "B" ratified the original agreement; under the contract defendant is obligated to pay to plaintiff the sum of money specified in the contract and defendant agreed to direct the payments of such sums to be made to the plaintiff; defendant has failed and refused to pay the money due under the contract; demand has

been made upon defendant for an accounting and a disclosure of contracts she now has, or claims to have, with one Phil Spitalny on the radio program known as "The Hour of Charm"; defendant has failed and refused to disclose to plaintiff the contracts under which she has been employed and on more than one occasion has refused to comply with a demand for an accounting; under the circumstances plaintiff's right to recover in an action at law is inadequate; plaintiff is entitled to an accounting of all moneys received by defendant and defendant should be required to disclose the terms of the contract under which she is working and the amount she has received thereunder; plaintiff is entitled to the specific performance of the attached contracts.

The amendment to the original petition was:

"That Plaintiff has performed each, every, and all of the obligations, requirements, and duties imposed upon her by the contracts attached to and incorporated in her said petition as Exhibits 'A' and 'B' thereto. More specifically, plaintiff alleges that she did in fact coach, teach, instruct, and train the said defendant for development of her singing talents and in regard to such matters as poise, personality, and demeanor; that she obtained and paid for instructors and tutors for said defendant, and exerted her best efforts to develop the talents of said defendant and to qualify said defendant for a musical career; and that she, through her contacts, was instrumental in obtaining for defendant her engagement with Phil Spitalny. That, in addition to the expenditure of her time and effort, this plaintiff expended approximately $5,-000.00 on behalf of defendant in obtaining instructors and tutors for said defendant and in furthering her musical education and career, all in accordance with and pursuant to said contracts, Exhibits 'A' and 'B' to plaintiff's said petition."

The contracts, exhibits "A" and "B," are appended to and made a part of this opinion.

The trial court sustained the demurrer to the amended petition on the ground the contract was "so indefinite and uncertain that nobody was bound." From the memorandum opinion of the trial court it appears the court also may have concluded that by reason of such defect the contract lacked mutuality.

We shall turn at once to the basic ruling that the contract was too indefinite. This finding was based solely on paragraph 1 of exhibit "A" and involved the pronoun "she" and its proper antecedent. Touching that subject the court said:

"Paragraph 1 of the contract sued on may be interpreted in three ways:

"1. 'The party of the third part' hereby agrees to engage and hire instructors and teachers for the musical education of the second party as she (the

said third party) in her judgment and discretion may deem necessary and/or advisable, and for such time and period as she (the said third party) may decide upon.

"2. It may read thus, to-wit: 'Party of the third part' hereby agrees to engage and hire instructors and teachers for the musical education of the second party as she, to-wit: 'The second party' in her judgment and discretion may deem necessary and/or advisable, and for such time and period as she to-wit: (The second party) may decide upon.

"3. The party of the third part hereby agrees to engage and hire instructors and teachers for the musical education of the second party, as she, to-wit: (the first party) in her judgment and discretion may deem necessary and/or advisable, and for such time and period as she, to-wit (the said first party) . may decide upon."

It is therefore clear the court held the contract invalid solely on the ground it could not be determined from paragraph 1 whether plaintiff, defendant or defendant's mother was vested with the right to select additional tutors and instructors for defendant. Defendant's mother, the first party, is not mentioned in that paragraph. We therefore cannot follow the trial court's third possible interpretation. If only that single paragraph of the contract could be considered we would find little difficulty in concluding the pronoun "she" referred to the third party, the plaintiff, as the person who agreed to engage and hire such instructors and tutors "as she . . . in her judgment and discretion may deem necessary and/or advisable, and for such time and period as she . . . may decide upon." It is not reasonable to assume the minor student was intended to have the right to determine such an important matter when plaintiff was required to assume the duty and responsibility of properly training this minor. Reasonable rather than unreasonable interpretations are favored by the law. (*Southwest Kan. Oil & G. Co. v. Argus P. L. Co.*, 141 Kan. 287, 292, 39 P. 2d 906; *Brooks v. Mull,* 147 Kan. 740, 747, 78 P. 2d 879.) But we need not resort to assumption in this case. The meaning of a contract should never be determined by a critical analysis of a single or isolated provision but should always be ascertained by a consideration of all pertinent provisions. In *Federal Land Bank v. Girtch,* 151 Kan. 528, 99 P. 2d 768, the general and long established rule was followed and stated thus:

"Where ambiguity or uncertainty is involved, the intention is not ascertained from punctuation alone or by resort to literal interpretation, but by considering all language employed, circumstances existing when the agreement was made, the object sought to be attained, and other circumstances, if any, which tend to clarify the real intention of the parties." (Syl. ¶ 2.)

See, also, *Skelly Oil Co. v. Cities Service Oil Co.*, 160 Kan. 226, 231, 160 P. 2d 246.

Applying the rule which requires courts to ascertain the intent of parties from the "four corners" of the instrument we are obliged to conclude any ambiguity which may exist in paragraph 1 vanishes. See introductory paragraphs of contract which narrate the facts and circumstances under which the contract was made and the object sought to be attained. See, also, paragraphs 3, 4, and 5 which we think quite definitely resolve all lingering doubt, if any, on the subject. According to the allegations of the petition, admitted on demurrer, the parties by operative construction have left no doubt about the right of plaintiff to hire and pay for additional instructors and tutors. (See amendment to petition.) In case of actual ambiguity the operative construction by the parties is of controlling significance. (*Kirkpatrick v. Chrysler Sales Corp.*, 127 Kan. 724, 730, 275 Pac. 155; *Rolander v. Sanderson*, 141 Kan. 809, 812, 43 P. 2d 1061.)

Plaintiff states defendant did not urge indefiniteness below as a ground of her demurrer. Defendant does not now contend the contract was invalid by reason of the indefiniteness of paragraph 1 but contends the contract lacked mutuality and was in restraint of trade.

In order to be enforceable a contract must, of course, possess mutuality. If it does not bind the parties thereto no contract exists. (*Railsback v. Raines*, 110 Kan. 220, 223, 203 Pac. 687.) Unless the parties are bound there is no mutuality and no valid consideration. (See comment note 137 A. L. R. 919, 923.) It is, however, elementary that consideration for a promise may be a return promise. (*Berkey v. Smith*, 138 Kan. 792, 795, 28 P. 2d 763; Restatement, Contracts, § 75.)

This contract, following its introductory paragraphs, in part, reads:

"Now, THEREFORE, in consideration of the agreements and covenants *and mutual promises* herein contained on the part of the parties hereto to be kept and performed, it is hereby understood and agreed as follows:" (Our italics.)

Were there in fact mutual promises? The plaintiff agreed:

(A) She would "coach and train" defendant "for the development of her singing talents, and in regard to such matters as poise, personality and demeanor."

. (B) She would engage such other instructors and tutors for defendant "as she in her judgment and discretion may deem necessary and/or advisable,

and for such time and periods as she may decide upon" and to pay all charges therefor.

(C) She would act as "the sole and exclusive manager and agent" of defendant with authority to contract for all defendant's services, performances and auditions.

(D) She would handle all publicity for defendant.

(E) She would forego all compensation for her services until and unless defendant secured professional employment at a salary of at least $100.00 per week and would accept as full compensation for all her services and expenditures 10% of all, if any, weekly earnings of $100.00 or more received by defendant during, but only during, a period of seven years from the date of the written contract.

Defendant, in turn, agreed (her mother joining in the agreement):

(A) Not to employ or accept tutelage from any musical instructor without plaintiff's written consent.

(B) To engage plaintiff's services as defendant's exclusive manager and agent, with authority to contract for all performances to be rendered by defendant; and in this connection, to give such performances and auditions as plaintiff might request and to refrain from giving performances without plaintiff's written consent; to entrust all publicity to plaintiff and not to solicit or procure publicity without the written approval of plaintiff.

(C) To conduct herself properly and with fitting decorum, avoiding all unfavorable publicity and notoriety.

(D) To pay plaintiff 10% of all, if any, professional earnings equal or exceeding $100.00 per week which defendant might obtain during, but only during, the next seven years following the execution of the written agreement.

These were the principal mutual promises. It is argued some provisions of the contract, as for example, paragraph 1, left plaintiff free to employ or not employ additional instructors and tutors and hence she was not bound to do so and the contract therefore lacked mutuality. We cannot agree. In paragraph 2 defendant expressly acknowledged the fact plaintiff previously had coached her. The same paragraph contains the further express and absolute promise of the plaintiff to coach and train the defendant not only for the development of her singing talents but in regard to such matters as poise, personality and demeanor, all essential qualifications of a finished artist. The agreement of plaintiff to employ and pay for such additional instructors and tutors as in her judgment were deemed necessary was merely supplemental to plaintiff's direct and positive promise previously mentioned. True, any discretionary promise supplemental to the primary and absolute promise should be exercised in good faith. So, too, the acceptance by plaintiff of the exclusive management and agency of defendant

constitutes an assumption of such duties. (*Wood v. Duff-Gordon,* 222 N. Y. 88, 118 N. E. 214.) Those duties must also be exercised in good faith.

In the famous case of *Madison Square Garden Corporation, Ill., v. Carnera,* 52 F. 2d 47, the defendant attempted to avoid the contract in order to box Sharkey. This he sought to do on the ground the contract contained no express provision to arrange any match for him. The court said:

"The defendant points to what is claimed to be lack of consideration for his negative promise, in that the contract is inequitable and contains no agreement to employ him. It is true that there is no promise in so many words to employ the defendant to box in a contest with Stribling or Schmeling, but the agreement read as a whole binds the plaintiff to do just that, provided either Stribling or Schmeling becomes the contestant as the result of the match between them and can be induced to box the defendant. The defendant has agreed to 'render services as a boxer' for the plaintiff exclusively, and the plaintiff has agreed to pay him a definite percentage of the gate receipts as his compensation for so doing. The promise to employ the defendant to enable him to earn the compensation agreed upon is implied to the same force and effect as though expressly stated." (p. 49.)

The applicable rule touching contracts of this character is well stated in 12 Am. Jur., Contracts, as follows:

"§ 259. Contracts for Services . . . the rule that one who undertakes to accomplish a certain result impliedly agrees to do everything necessary to accomplish such result is applicable to contracts for the performance of services. Whatever is necessary to be done in order to accomplish work specially contracted to be performed is part of the contract, though not specified."

To the same effect is *Sykes v. Perry,* 162 Kan. 365, 176 P. 2d 579, where a veterinarian was required to comply with an implied covenant to continue in his practice.

So in the instant case the law implies the obligation of the plaintiff to exercise her honest judgment where she possesses discretionary power in the performance of the contract. (1 Williston on Contracts, Rev. ed., § 43.) On demurrer to the petition the good-faith performance of that part of the contract pertaining to the employment of additional instructors or the good-faith performance of every other contractual provision, alleged to have been performed, is admitted.

The amended petition alleged full performance of the contract by plaintiff, including employment and expenditures by her of $5,000 for additional instructors and tutors and the obtaining of a professional engagement for defendant with Phil Spitalny on "The Hour

of Charm." The amended petition disclosed that engagement and in exhibit "B" defendant acknowledged her liability to plaintiff thereunder.

Absence of inceptive mutuality constitutes no defense to the enforcement of an executed contract. (*Nelson v. Schippel*, 143 Kan. 546, 552, 56 P. 2d 469; *Kilmer v. Victory Sand & Stone Co.*, 153 Kan. 381, 110 P. 2d 798.) The case of *Sharpless v. J. B. Kirk Gas & Smelting Co.*, 128 Kan. 722, 280 Pac. 788, relied upon by defendant, is not controlling here.

It is true seven years have not elapsed since the making of the alleged contract. If paragraph 7 of the contract is subject to the interpretation that plaintiff had not fully completed her obligations thereunder, the demurrer at least admits plaintiff has fully performed to date. The contract is not invalid for lack of mutuality. The petition states a cause of action for present relief unless the contract is otherwise unenforceable.

Does the contract contravene prohibitions against restraint of trade? Defendant contends it violates G. S. 1935, 50-101 and 50-112, provisions of our antimonopoly law, and the common-law doctrine against restraint of trade. The substance of the contention is the contract restrains defendant's liberty in that it restricts her right to sing, to employ instructors for the development of her talents, the right to contract personally for her services without plaintiff's intervention and the right to determine compensation for her services. Defendant stresses the italicized language in a portion of G. S. 1935, 50-112, to wit:

"That all arrangements, contracts, agreements, trusts, or combinations between persons . . . which tend to advance or control the rate of interest for the loan or use of money to the borrower, *or any other services,* are hereby declared to be against public policy, unlawful and void."

We do not deem it necessary to repeat the mutual promises previously enumerated or to restate the restrictive covenants contained in the appended contract. Nor do we think it essential in this case to review the numerous decisions and statements of text writers collected by industrious and able counsel. The helpfulness of exhaustive briefs is, however, acknowledged and commended.

At the outset it should be stated the authorities are consistent and clear in the view that no hard-and-fast rule governing all cases of this character can be laid down. Abstract tests which have been suggested are not always adequate. The real question is never

whether there is any restraint of trade but always whether the restraint is reasonable in view of all the facts and circumstances and whether it is inimical to the public welfare. If it is reasonable and does not contravene public welfare the contract will be upheld. (2 Page on Contracts, § 776; Restatement, Contracts, § 514; 5 Williston on Contracts, Rev. Ed., § 1636.) Our own decisions are to the same effect. A few of them are: *Mills v. Cleveland,* 87 Kan. 549, 125 Pac. 58; *Kent Oil Co. v. Waddill,* 127 Kan. 704, 274 Pac. 1113; *Berkey v. Smith,* 138 Kan. 792, 796, 28 P. 2d 763; *Southwest Kan. Oil & G. Co. v. Argus P. L. Co.,* 141 Kan. 287, 39 P. 2d 906.

The old rule as to limitations of time and space has given way to that of reasonableness. (*Fox v. Barbee,* 94 Kan. 212, 146 Pac. 364.) The question of reasonableness of a contract of this character frequently depends upon fundamental elements of common fairness in view of the facts and circumstances of the parties. (*Berkey v. Smith,* supra, p. 796.) Our own cases relied upon by defendant are: *Keene v. Gas Co.,* 69 Kan. 284, 76 Pac. 834; *Mills v. Ordnance Co.,* 113 Kan. 479, 215 Pac. 314. They are not controlling in this case. The Keene case involved an agreement concerning the generating and furnishing of electricity for public and private use and was held to be in contravention of public policy. The Mills case involved a contract for the purchase of tractors at the seller's published list prices and was held to violate the anti-monopoly statutes. Cases cited by defendant from other jurisdictions have been examined with interest. We think our own decisions control this case.

It could not well be, and we think it is not seriously, contended the instant contract is inimical to the public welfare. The remaining question is, did the restrictive covenants constitute an unreasonable restraint of this defendant? Of course, at the inception of the agreement defendant had no established trade or profession. Her concern was to obtain one. Her talents were in the rough. She was without means to develop them. The vital need of proper contacts with artists was lacking. She and her mother were obliged to discover someone who would be interested in the development of the daughter's potential qualities. Someone had to be found who was willing to take the chances involved in the long and tedious processes of training not only a voice but in developing poise, personality and demeanor, all highly important qualities of a pleasing and successful entertainer.

In short, it was imperative to discover someone who would endeavor to produce the multitude of qualities so essential to an artist in a highly competitive field. After such a person was found in the plaintiff seven years were deemed necessary for the undertaking. During this early period of development it was imperative that well-recognized pitfalls should be studiously avoided. These things are not presumptions. The contract expressly discloses them. These precautionary provisions regarded as mutually advantageous form the restrictive covenants of this agreement. Only on the basis of such restrictive covenants was plaintiff willing to accept employment by defendant and to speculate on a seven-year venture with the hope that the designated remuneration would finally be forthcoming.

Were these restrictive covenants unreasonable under all the circumstances? We would hesitate to so rule. A decision denying the reasonableness of this agreement, under the instant circumstances, might well deprive many a deserving young boy or girl of opportunities for development and of a notable career. It was on the terms designated that defendant, with the approval and agreement of her mother, was able to induce the plaintiff to undertake this highly delicate and venturesome task. Under the facts and circumstances expressed in the agreement and admitted on demurrer we think plaintiff, an employee, should not be held to have forfeited her right to the agreed compensation for services rendered on the theory the contract was in restraint of trade.

The order sustaining the demurrer to the petition is reversed.

### "AGREEMENT (Exhibit 'A')

"THIS AGREEMENT made and entered into this 3rd day of October, 1941, by and between Nelle C. Park, of Wichita, Kansas, mother of the second party herein named, and hereinafter referred to as the first party, and LUCILE JEANNE PARK, of Wichita, Kansas, daughter of the first party, and hereinafter referred to as the second party, and BESSIE B. HECKARD, of Wichita, Kansas, hereinafter referred to as the third party.

#### "WITNESSETH:

"Whereas, the second party is a minor, under the age of twenty-one (21) years and living under the care and custody of the first party, and

"Whereas, the parties of the first and third part are desirous of promoting a musical education, opera, radio, theatrical and motion picture career for the second party, and

"Whereas, the first and second parties are without financial means with which to promote such education and career as aforesaid, and

"Whereas, the third party is fully experienced and well equipped to lend her services toward the development, coaching and improvement of the musical education and career, as aforesaid, of the second party, and

"Whereas, said third party has made innumerable contacts with persons who can lend their aid and assistance toward the musical education, opera, radio, theatrical and motion picture career of the second party, and is willing to lend such aid to the first and second parties until such time as the second party obtains a contract.

"Now, THEREFORE, in consideration of the agreements and covenants and mutual promises herein contained on the part of the parties hereto to be kept and performed, it is hereby understood and agreed as follows:

"1. Party of the third part hereby agrees to engage and hire instructors and tutors for the musical education of the second party as she in her judgment and discretion may deem necessary and/or advisable, and for such time and periods as she may decide upon.

"2. Said third party has heretofore coached and hereby agrees to coach and train the second party for the development of her singing talents, and in regard to such matters as poise, personality and demeanor.

"3. Party of the third part further agrees to pay for any and all instructors and tutors that she may provide and secure for the second party, or said third party may appoint an agent for said purpose, and in that regard it is distinctly understood and agreed by the parties hereto that the second party shall not retain, hire or engage any instructors whatsoever without the written consent of the third party nor shall said second party receive any instructions, tutelage or lessons from any persons whatsoever, towards the development of her musical career without the written consent of the third party.

"4. The parties of the first and second part hereby retain and engage the services of the third party as the sole and exclusive manager and agent of the second party, with full authority to contract for all services, performances and auditions of the second party, and in that regard it is distinctly understood between the parties that the second party shall not engage in any musical performance of any kind whatsoever, nor shall she give any public or private auditions, performances or exhibitions, whether for compensation or otherwise, without the written consent of the third party.

"5. All of the parties hereto are fully aware that the second party is inexperienced and requires further musical development, and that she is not fully prepared to professionally offer her services at the time of the making of this contract, and that it will require training and development before she will be in a position to render such services; and the first and second parties realize that it will take time before said second party is able to earn any compensation for any professional singing and/or theatrical performances, therefore, the compensation of the third party as manager and agent of the second party shall not commence until such time as the second party commences to earn such compensation. That the compensation of the third party shall be a sum equal to ten per cent (10%) of the weekly earnings of the second party, provided, however, the amount of the earnings of the second party shall be One Hundred Dollars ($100.00), or more, a week.

"6. It is further understood and agreed between the parties hereto that

the second party shall at the request of the third party, render professionally, as she may request, and shall at no time refuse to give such auditions and/or performances as the said third party may request.

"7. This contract shall continue for a period of seven (7) years from the date hereof, and the said first party hereby binds herself to said agreement until the said second party reaches the age of majority, and that the second party hereby agrees that the contract shall continue for the entire seven (7) years and will keep and perform all the terms and conditions of this agreement.

"8. The second party agrees to conduct herself properly and with fitting decorum, and shall avoid all unfavorable publicity and/or notoriety.

"9. It is further understood and agreed that all publicity shall be handled by the third party, and the first and second parties shall not solicit or procure any publicity without the written consent of the third party.

"IN WITNESS WHEREOF, the parties hereto have set their hands and seals the day and year first above written.

"NELLE C. PARK<br>
"First Party<br>
"LUCILE JEANNE PARK<br>
"Second Party<br>
"BESSIE B. HECKARD<br>
"Third Party"

"MEMORANDUM OF AGREEMENT (Exhibit 'B')

"This memorandum of agreement made this 3rd day of January, A. D. 1945,
"By and between

Jeannie Park, of Wichita, Kansas, as
First Party,

"AND

Bessie B. Heckard, of Wichita, Kansas, as
Second Party,

"WITNESSETH:

"That on the 3rd day of October, 1941, a contract was entered into between Nelle C. Park, mother of Lucille Jeannie Park, and Bessie B. Heckard, which contract is made a part hereof by reference;

"That on the 11th day of December, 1944, at New York City, New York, said Jeannie Park directed to Phil Spitalny, Park Central Hotel, 56th Street and Seventh Avenue, New York City, a letter of proposed employment, a copy of which is hereto attached and made a part of this agreement. That under said agreement the said Jeannie Park, as therein shown, agreed to become a member of the organization known as 'The Hour of Charm' and to perform certain other services in the capacity of a singer, as set forth in said attached exhibit.

"Under the terms of said first mentioned contract said Bessie B. Heckard, as instructor, manager, and otherwise, as provided in said first mentioned contract, is entitled to receive a sum equal to ten (10%) per cent of the compensation received by the said Jeannie Park under the terms of said employment, all as set forth in the terms of said first mentioned contract, and employer shall be directed to make payment to second party.

"The parties hereto re-affirm their contract of October 3, 1941, in all of its particulars and terms, and as provided by the terms of said contract of October 3. 1941, the said Bessie B. Heckard hereby gives her consent and approval to the employment by the said Phil Spitalny and the said Jeannie Park represents that the said Spitalny has accepted the terms of said agreement agreeing to the proposal hereto attached.

"In Witness Whereof, the parties hereto have hereunto set their hands and caused this agreement to be executed on this, the day and year first above written.

"Jeannie Park

"First Party

"Bessie B. Heckard

"Second Party

"O. K.

"Mrs. Ray Park

"New York, N. Y.

"December 11, 1944

"Mr. Phil Spitalny

"Park Central Hotel

"56th St. & 7th Avenue

"New York, N. Y.

"Dear Mr. Spitalny:

"This will confirm our agreement that I, JEANNIE PARK, accept the engagement to become a member in your organization, known as 'The Hour of Charm.'

"I agree to abide by all the rules and conditions of said organization, which are in existence at present.

"It is understood that my services will be with the 'Hour of Charm' exclusively, and that I am not to appear anywhere in any capacity as singer, without your written permission.

"As singer,—you have the exclusive right to contract for my services,—for radio, recording, motion pictures, concerts, theatre and all other appearances.

"My salary is to be $100. (ONE HUNDRED DOLLARS) per week for the radio program only.

"Any other engagements, besides the radio, I am to receive an additional ONE HUNDRED ($100.00) DOLLARS per week.

"This agreement is for the period of ONE (1) year, beginning January 15, 1945 and ending January 15, 1946.

"I also grant you an option for one more year, beginning January 15, 1946, and ending January 15, 1947,—all under the aforementioned conditions, except the salary to be for the second year,—TWO HUNDRED ($200.00) DOLLARS per week, and for radio only; Also, TWO HUNDRED ($200.00) DOLLARS per week for other engagements.

· "Sincerely yours,

"Jeannie Park

"Witnessed by

"Roy Campbell"