**BYERS TRANSPORTATION COMPANY, Inc., a Missouri corporation, Appellant,**

v.

**The FOURTH NATIONAL BANK & TRUST COMPANY, WICHITA, a corporation, J. W. Rickman, James Dean Rickman, Patricia Ann Rickman, and J. W. Rickman, Jr., Appellees.**

**No. 7385.**

United States Court of Appeals
Tenth Circuit.

June 29, 1964.

Rehearing Denied Aug. 3, 1964.

823

John E. Shamberg, Kansas City, Kan. (Joseph Cohen, Charles S. Schnider, Joseph P. Jenkins, Barton P. Cohen, Jacob F. May, Jr., Frederick K. Cross and Norma Braley, Kansas City, Kan., with him on the brief), for appellant.

Malcolm Miller, Wichita, Kan. (Robert C. Foulston, Wichita, Kan., with him on brief), for appellees.

Before MURRAH, Chief Judge, and PICKETT and LEWIS, Circuit Judges.

MURRAH, Chief Judge.

This is an appeal from a judgment of the trial court in an interpleader action awarding appellees-Rickmans the escrow deposit of appellant-Byers Transportation Company as liquidated damages for failure of Byers to comply with a contract between the parties.

The contract provided for Byers to acquire control of Freight Ways, Inc., a common carrier of freight, through the purchase of capital stock owned by the Rickmans and the merger of their operating rights and property. Consummation of the sale was necessarily and expressly contingent upon the approval of the Interstate Commerce Commission

pursuant to 49 U.S.C. § 5(2) (b), and the contract pertinently provided that "In the event the Interstate Commerce Commission shall refuse to approve the application of Buyers [Byers] without modification and in its entirety to purchase the stock owned by Stockholders [Rickmans] in Freight Ways, Inc., this contract shall terminate on the date of such disapproval. In connection with the application before the Interstate Commerce Commission if the Interstate Commerce Commission shall revoke or terminate any part of the operating authority held by Freight Ways, Inc. * * * then Buyer shall have the option to terminate the contract. If Buyer has faithfully fulfilled the provisions of this contract between the date of the execution thereof and such date of termination, this contract shall be null and void and of no further force or effect." The contract appropriately provided for a "closing date" to follow issuance of the I.C.C. order.

The I.C.C. issued its order on October 18, 1960 approving the transaction and authorizing a merger of the routes under a new certificate of public convenience and necessity, but conditioned upon abandonment of certain irregular commodity routes authorized to, but not used by, Freight Ways. Thereafter, the parties, at Byers' request, met on October 29, 1960, and discussed a reduction in the purchase price, Byers contending that the contract price should be substantially reduced by reason of the Commission's failure to include the irregular routes; and the Rickmans contending that the routes, never having been used, were worthless and, therefore should make no difference in the contract price. No agreement upon a new purchase price was reached; but Byers agreed to petition the I.C.C. to reconsider its order; and the parties apparently agreed to extend the closing date from the undisputed contractual date of November 30 to December 31, 1960. Another meeting held on December 1 was fruitless. On December 2, the Rickmans submitted a proposal which included a reduction in the purchase price and other adjustments. Byers responded by making a counteroffer on December 12, which in effect adopted the Rickmans' proposed adjustment in the stock price, but varied the other modifications. The Rickmans seemed to demonstrate their dissatisfaction by requesting Byers to return certain information previously furnished by Freight Ways. On December 30, 1960, Byers informed the Rickmans by telegram that the contract was considered as terminated due to the failure of the I.C.C. to approve the application without modification; and that Byers was, therefore, reclaiming its escrow deposit. In a letter, dated January 3, 1961, the Rickmans advised that they were demanding surrender of the deposit as liquidated damages. The escrow agent then commenced this interpleader proceedings pursuant to 28 U.S.C. §§ 1335 and 2361.

The pretrial order, framing the triable issues and contentions of the parties, may be summarized as whether the I.C.C. order automatically terminated the contract entitling Byers to its deposit; or whether under the contract Byers was granted an option to terminate or to continue the contract and, if so, did Byers exercise it; or if the contract was automatically terminated, did the parties enter into a new contract under which the Rickmans were entitled to the deposit.

The trial court construed the contract as not being automatically terminated by the I.C.C. conditional order; and held that the parties did not subsequently enter into a new contract; but that the contract "provided specifically for the contingency that the I.C.C. might revoke or terminate a part of the operating authority", in which event Byers was given the option to terminate the contract; and that Byers failed to exercise its option to terminate prior to the November 30 closing date, thereby entitling the Rickmans to the escrow funds as liquidated damages.

On appeal, as below, Byers contends that the contract was automatically terminated upon the issuance of the I.C.C. order and without any affirmative act on

its part. This contention is based upon the theory that the Commission's approval of the transfer in its entirety was a condition precedent to Byers' duty to perform its part of the contract. See Hyland v. Dewey, 146 Kan. 797, 73 P.2d 1038. And, Byers seeks to sustain its position by relying solely upon the first sentence of the termination provision which, as we have seen, provides for termination upon the date of the Commission's refusal to approve the application of Byers " * * * without modification and in its entirety to purchase the stock * * *." Byers would then construe the next sentence of the contract the "option to terminate" if the Commission revokes " * * * any part of the operating authority * * *", as a unilateral right to breathe life into the extinct contract and thereby continue it until the closing date.

■■ This interpretation of the contract is contrary to the universally accepted canon of construction, according to which a contract is construed by the whole of its parts. See: Weiner v. Wilshire Oil Co. of Texas, 192 Kan. 490, 389 P.2d 803; Heckard v. Park, 164 Kan. 216, 188 P.2d 926, 175 A.L.R. 605; Moore v. Jones, 215 F.2d 719 (10 CA); Restatement of Contracts, § 235(c); 3 Corbin Contracts, § 549 (1951); 4 Williston Contracts, § 613 (3rd Ed., 1961). Conjunctive analysis of the two sentences reveals that they are reconcilable only if the first is interpreted as applying to the purchase of stock and the second to operating rights. Common sense dictates that Byers would not desire to consummate the transaction without acquiring all the stock, but with this control, it would consider merger even though it was not permitted to acquire all the operating rights. It is entirely reasonable to read the contract as giving Byers an option to terminate if it did not obtain all the operating rights; it is wholly inconsistent and inadmissible to read the contract as giving Byers the option to continue it if, as contended, it automatically expired with the issuance of the I.C.C. conditional order.

We agree with the trial court's construction of the contract; and this would lead to affirmance of its judgment if we could accept its finding that Byers did not exercise its option to terminate before the November 30 closing date. We think, however, that the conduct of the parties and the attendant circumstances clearly indicate that the parties extended the closing date until December 31, 1960.

■■ The parties were of course free to alter, modify, abrogate or rescind the contract; and an agreement to do so may be implied from their conduct. See Bankoff v. Wycoff, 10 Cir., 233 F.2d 476. Dean Rickman, Jack Rickman, Jr. and Paul Byers, officers of their respective companies, testified that during the meeting on October 29, at which they represented their companies, all agreed to extend the closing date.[1] The meetings, the supplying of Byers with information on Freight Ways, and the exchange of proposed supplemental agreements indicate the continued desire of both parties to salvage the transaction. It is significant that, although not productive, a meeting did take place on December 1, the day after the contractual closing date. The next day the Rickmans wrote a letter to Paul Byers in which they stated that "we agreed on a closing date of December 31, 1960"; and then they set forth their proposed modifications. It is too plain for doubt that the closing date was extended to allow further negotiations in view of the I.C.C. conditional order. Indeed, even the trial court seemed

1. Dean Rickman testified that: "I brought up the point of extending the contract on to one more month * * *; "and that "Mr. Paul Byers stated that he would agree to extend the date on to the last day of the year, December 31 * * *." Jack Rickman, Jr. stated that Paul Byers " * * * mentioned that they would take the contract as stated and make a closing date, if it was agreeable, to the end of the year."

Paul Byers, when asked if he agreed that the closing date would be December 31, answered: "I think that is true."

to agree. During the testimony of Paul Byers the following colloquy occurred:

"The Court: The only modification of the written contract that the meeting of October 29th discloses to the Court is the extension of the closing date to December 31st, 1960, which is not in dispute, as near as the Court can tell, by either of the parties.

\*     \*     \*     \*     \*     \*

"The Court: If there is evidence, I would like to have it shown to me, but the only evidence I have, undisputed evidence, is that the closing date of the old contract was determined upon. And this closing date, as I understood the testimony, and counsel correct me if I am wrong, was a closing date of December 31st, 1960.

"Mr. Brick [Counsel for Byers]: That is my understanding.

"The Court: I think every party testified to that.

"Mr. Foulston [Counsel for Rickman]: I don't think there is any question about that, Your Honor.

"The Court: All right \* \* \*."

In its memorandum opinion, the court specifically found that the closing date was November 30; and, in so doing, disclosed no reason for receding from its initial conclusion. The Rickmans suggest that the only basis for this apparent about-face are the statements of Harry Byers on cross examination in which he revealed that Paul Byers did not have the authority to extend the closing date, but merely to negotiate.[2]

It is clear, however, that the purpose for extending the closing date was to allow more time for the parties to negotiate. Even Harry Byers, in his counter-offer of December 12, referred to "closing date" numerous times. It is, therefore, inconceivable that either party was laboring under the illusion that November 30 remained the closing date. In these circumstances the finding of the trial court that the closing date was not extended is clearly erroneous. See Rule 52 (a) F.R.Civ.P. 28 U.S.C.

■■ It was suggested in oral argument that if the closing date was in fact extended, it was without consideration and therefore of no effect. It is true that an oral agreement purporting to change a written contract on the same subject "must be supported by fresh and independent consideration." Frogge v. Belford, 168 Kan. 74, 211 P.2d 49, 52. But, the mutual advantages and obligations manifest in continued negotiations toward the consummation of the original contract was new and sufficient consideration for the agreement to extend the closing date. See 12 Am.Jur. § 412.

It is undisputed that Byers' telegram of December 30 was sufficient notice to terminate the contract. We hold, therefore, that Byers is entitled to have its escrow deposit returned.

The judgment is accordingly reversed.

---

2. "Q. [Counsel for Rickmans] You understand when Paul came back from his conference here in Wichita that the closing date was to be December 31st, didn't you? A. [Harry Byers] If we came to an agreement.

"Q. I didn't ask you about that, did I? I asked you if you understood the closing date was to be December 31st. A. That is right.

"Q. And Paul had full authority to make that much of an agreement for you, didn't he? A. No, sir, he did not.

"Q. You mean you weren't going to carry out the closing date either, then? A. If we came to an agreement, we would have carried out the closing date, but we had no agreement. So the closing date made no difference.

"Q. I didn't ask you that. You have testified flatly here that Paul Byers didn't have any authority to make any agreement for you down there. A. That is right; he had authority to negotiate and that is as far as it went."