No. 30,214.

The City of Holton, *Appellee,* v. The Kansas Power and Light Company and The City of Soldier, *Appellants.*

No. 30,215.

The City of Holton, *Appellee,* v. The Kansas Power and Light Company and The City of Mayetta, *Appellants.*

No. 30,216.

The City of Holton, *Appellee,* v. The Kansas Power and Light Company and The City of Circleville, *Appellants.*

No. 30,241.

The City of Holton, *Appellee,* v. The Kansas Power and Light Company and The City of Havensville, *Appellants.*

(9 P. 2d 675.)

Opinion filed April 9, 1932.

*Thomas F. Doran, Clayton E. Kline, Harry W. Colmery* and *M. F. Cosgrove,* all of Topeka, for appellant the Kansas Power and Light Company; *E. D. Woodburn,* of Holton, for appellants the cities of Soldier, Mayetta, Circleville and Havensville.

*Albert M. Cole,* city attorney, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The first of the above-entitled actions was one by the city of Holton against the city of Soldier and the Kansas Power and Light Company, to enjoin breach of a contract between plaintiff and the city of Soldier. Similar cases were commenced by Holton against the cities of Mayetta, Circleville and Havensville, and the Kansas Power and Light Company, to obtain the same relief. The four actions were consolidated for trial, and judgments were rendered for plaintiff. The defendants appealed, and the appeals were heard together. Speaking generally, the legal questions involved are the same in all the cases. Some differences in the facts will be noted.

Holton, the county seat of Jackson county, is a city of the second class, and owns and operates an electric light plant. In a northwesterly direction from Holton are Circleville and Soldier, in Jackson county, and Havensville in Pottawatomie county. In February, 1916, Holton entered into contracts with Circleville, Soldier and Havensville to supply those cities and their inhabitants with electricity for periods of twenty years, the contracts, however, to be terminable at the end of ten years. Each contract provided that Holton would supply the current at the Holton plant, and that the purchaser would, in conjunction with others, construct, maintain and keep in repair at its own expense a transmission line from the Holton plant to the purchasing city. The transmission line was built, and Holton furnished current to the purchasing cities, which provided their own distribution systems. The contracts were not terminated at the end of ten years.

South of Holton is Mayetta. In March, 1923, Holton contracted to supply electric current at its plant to Mayetta for ten years, and thereafter unless notice of discontinuance were given. Mayetta agreed to construct, maintain and keep in repair at its own expense the transmission line. The transmission line was constructed, Mayetta provided its own distribution system, and current was furnished by Holton pursuant to the contract.

In April, May, October and December, 1928, the Kansas Power and Light Company purchased the transmission lines, and purchased the distributing systems within the various cities. The contracts were approved by the public service commission on the following dates: Circleville, June 7, 1928; Soldier, June 18, 1928; Mayetta, November 13, 1928; Havensville, January 18, 1929. Franchises were duly granted by the cities to the Kansas Power and Light Company to supply the cities and their inhabitants with electric current. The purchaser took possession of the transmission lines and distributing systems, and has been supplying the cities and their inhabitants with electric current produced at Holton.

The contract between Holton and the purchasing cities provided for installation by Holton of recording meters to measure the current supplied, for monthly meter readings, for verified monthly statements showing the current delivered during the preceding month, and for payment by the cities on the 15th of each month of a price per kilowatt for current delivered. After the Kansas Power and Light Company purchased the transmission lines and distribut-

ing systems, and without any negotiation or arrangement between Holton and the Kansas Power and Light Company, Holton sent its bills to the Kansas Power and Light Company, instead of to the cities, and the Kansas Power and Light Company paid the bills.

The Kansas Power and Light Company has a plant for the production of electric current just outside the city of Topeka, in Shawnee county, and, previous to purchase of the transmission lines referred to, had a transmission line of its own to Hoyt, in Jackson county, south of Mayetta. After purchase of the transmission lines, the Kansas Power and Light Company reconstructed its own line from Topeka to Hoyt to carry a high voltage, and constructed a high-voltage line from Hoyt to Mayetta, but did not connect it. As indicated, the Kansas Power and Light Company purchased the line from Mayetta to Holton. Beginning two miles south of Holton, the engineers of the Kansas Power and Light Company surveyed a route extending two miles west and then due north to the purchased Circleville line, and on this route constructed about five miles of transmission line. Onaga, a city of the third class, lies south and west of Havensville, and the Kansas Power and Light Company constructed a line from Havensville to Onaga, but did not connect it. The ultimate purpose is to have a high-voltage line from Topeka to Onaga and beyond, passing through Hoyt and Mayetta, passing west of Holton, and passing through Circleville, Soldier and Havensville.

In November, 1929, Holton commenced an action against Circleville and the Kansas Power and Light Company, to enjoin breach of the contract between Holton and Circleville, expiring in 1936, and commenced an action against Mayetta and the Kansas Power and Light Company to enjoin breach of the contract between Holton and Mayetta, expiring in 1933. In October, 1930, Holton commenced actions against Soldier and Havensville and the Kansas Power and Light Company, to enjoin breach of the Soldier and Havensville contracts, expiring in 1936. The actions were tried in November, 1930, and judgments were rendered on December 1, 1930. The court made no findings of fact, but found generally all issues in favor of plaintiff.

The petition in each case alleged that on Holton's entering into the contract with the purchasing city, it was necessary for Holton to invest large sums of money in machinery and equipment to fulfill the conditions of the contract. The superintendent of the water

and light department of Holton testified the Holton plant had been so constructed as to provide capacity to supply the outside cities. The date when construction commenced was not given, and every city contract recited that Holton "owns and operates an electric light and power plant in the city of Holton." The Mayetta contract was not made until seven years after the others were made. The superintendent did not testify that capacity of plant or amount of expenditure was determined with reference to any previously incurred obligation to supply any outside city, and so far as the evidence disclosed, Holton merely improved opportunity to preëmpt an unoccupied field, and constructed a plant having sufficient capacity to enable it to do so.

The petition in each case alleged that the Kansas Power and Light Company assumed performance of the contract between Holton and the defendant city. The proceedings at the trial disclosed an express contract of assumption was meant. The answers denied that the Kansas Power and Light Company assumed performance of the Holton contracts.

There was evidence that the agent of the Kansas Power and Light Company who negotiated with Soldier made oral statements that the Kansas Power and Light Company would assume Soldier's contract with Holton, and made such statements both before and after the contract was signed. The contract of purchase contained no assumption. Soldier was represented by an attorney whose conduct indicated he knew that no contract to assume the obligations of the Holton contract could be enforced unless in writing, because of the statute of frauds, and knew that part performance would not save an oral contract to assume. When the contract between Soldier and the Kansas Power and Light Company was signed, he raised the question of assumption of the Holton contract. The writing of a letter by the Kansas Power and Light Company was discussed. The purpose was to get the Kansas Power and Light Company "under writing," and a writing in the form of a letter was sent to the city at its request. The letter reads:

"*To the Mayor and Councilmen of Soldier, Kansas:*      MAY 29, 1928.

"GENTLEMEN—Pursuant to your request, this will advise you that as a part of the consideration to be paid to the city of Soldier for its electric distribution and street lighting system and transmission line, the Kansas Power and Light Company, in lieu of cash, hereby assumes payment of principal and interest on $3,200 worth of bonds of the city of Soldier, Kansas, now issued and outstanding.

"We further understand that, in addition to the consideration stated in ordinance No. 154, we hereby agree to protect and save harmless the city of Soldier on account of any electric purchase contracts which it may have with the city of Holton, Kansas, and agree, in case litigation develops, to defend the city of Soldier and to pay any costs of such litigation incident thereto, we of course reserving the right to employ our own attorneys in defense of such matter.

"We further understand that we are to assume the expense of ordinance publication, and should an election be called on account of petition of citizens, then and in that event the company will pay the cost of such election."

There was no testimony purporting to state any conversation between the agent of the Kansas Power and Light Company and officials of Soldier, relating to assumption, occurring after the letter was received, and the uncontroverted testimony was that after the letter was received the contract with and the bill of sale to the Kansas Power and Light Company were mailed by Soldier to the Kansas Power and Light Company. The result is, the contract of purchase and the letter constituted the contract with Soldier.

The answer of the Kansas Power and Light Company in the Mayetta case denied allegations of the petition not expressly admitted. Then followed the admissions—corporate capacity of the city and of the Kansas Power and Light Company, the contract between Holton and Mayetta, the granting by Mayetta of the franchise to the Kansas Power and Light Company, and the sale by Mayetta to the Kansas Power and Light Company of the transmission line and distributing system owned by Mayetta. Assumption of performance of Mayetta's contract with Holton was not admitted. Then followed affirmative defenses. The first defense was that the contract between Mayetta and Holton was void. The second defense was that the sale by the city to the Kansas Power and Light Company was duly approved by the public service commission of Kansas, as required by the laws of the state of Kansas; that the Kansas Power and Light Company assumed only such obligations under the contract as were incumbent on the city, and agreed to hold the city harmless relative thereto; and that a copy of the order of the public service commission was attached to and made a part of the answer. The third defense was that if the Holton contract was of any force, Holton had a plain and adequate remedy at law in case the contract was breached. The answer in the Circleville case was of like tenor.

The contracts between the Kansas Power and Light Company and Circleville, Havensville and Mayetta were produced at the trial.

The contracts with Circleville and Havensville contained no assumption clause whatever. The contract with Mayetta contained the following assumption provision:

"It is further agreed that, as a part of the purchase consideration, the company shall assume.all of the litigation of certain contracts now in effect by and between the city of Mayetta and the city of Holton, Kansas, and Denison, Kansas, and Holton-Wigwam Light Co., and the company hereby binds itself to hold the said city of Mayetta harmless in connection therewith."

Each petition contained an allegation that the defendant city and the Kansas Power and Light Company were threatening to and were about to disconnect the transmission line from Holton, and were threatening to and refusing to continue to fulfill the conditions of the contract. The evidence was that up to the time of trial there had been no refusal to comply with the terms of the contract. There was no evidence of any communicated or otherwise manifested threat to disconnect the lines from the Holton plant before any city contract expired. The activities of the Kansas Power and Light Company have been described. It was placing itself in position to supply current directly from Topeka to Onaga and beyond. This was construed by Holton as a threat to disconnect from Holton, but there was no evidence of intention immediately to disconnect.

The answers of the Kansas Power and Light Company denied threat to disconnect from Holton, but pleaded the contracts between Holton and the outside cities were void. The testimony was that the question whether the contracts were void came up after injunction suit was commenced. The attorney for the company, who was a director and secretary, advised the company he could not guarantee that the contracts were good or were bad. His opinion was that if the contracts were good they would be carried out; otherwise they would not be carried out; but he did not know the attitude of the company.

In selling electric current to outside cities Holton acted purely in its private, proprietary capacity, and as a producer and seller of electric current it stood on the same footing as the Kansas Power and Light Company.

The contract between Holton and each purchasing city contained the following provision:

"The first party agrees to furnish and sell to second party from its power plant electric current for light and power purposes, and shall furnish the same during the twenty-four hours of each day, sufficient for the wants of the second party under the terms and conditions of this contract, and said second party

agrees to purchase all the electric current used by it from the first party during the period of this contract."

Defendants contend the contract lacked mutuality of obligation, and consequently was void. The contention is the city did not promise to use, and hence purchase, any electric current. Defendants agree that a promise is a good consideration for a promise, but they say the city gave no promise to use, and hence to buy, in return for Holton's promise to sell. The so-called "will, wish and want" cases are cited in support of this contention.

The cases applying and misapplying the principle involved are numerous. By what this court regards as the better reason and the weight of authority, contracts of the precise nature here involved are regarded as containing what is called implied promise not to purchase elsewhere. This promise is a good return for the promise to sell, and the requirement of mutuality is satisfied.

In this instance it cannot be denied that use of electric current by the purchasing city, according to the needs of the city and its inhabitants, was regarded by the parties as of the essence and substance of the bargain. Pursuant to the contract, transmission line and distributing system were installed, electric current was used, electric current is still used, and the franchise to the Kansas Power and Light Company negatives idea of discontinuance of use. While the quantity to be used could not be determined in advance, and would likely vary from time to time, the city promised to buy from Holton all that was used. The positive engagement excluded purchase from anyone else. While a promise not to purchase from anyone else was not "expressed" in those very words, the promise is implicit in what was expressed, and the essentials of a valid contract are present. Selected decisions supporting this view are assembled in the opinion in the case of *Imperial Refining Co. v. Kanotex Refining Co.*, 29 F. 2d 193, C. C. A. 8th circuit (1928). The distinction between contracts of the kind here involved and true "will, wish or want" contracts is made clear, and another review of the authorities is not necessary.

As indicated, the action was one for injunction. The prayer of the petition follows:

"That on the final trial of this cause said defendants be permanently enjoined from violating the terms of said contract, and for such other and further relief as to the court may seem equitable and proper."

The judgment reads:

"It is therefore considered, ordered, adjudged and decreed that the defendants, and each of them, in the above-entitled cause, be permanently enjoined and restrained from violating any of the terms of the contract set out in plaintiff's petition herein . . ."

The contract not to buy from anyone but Holton created a negative duty on the part of the city. Speaking generally, a court of equity may prevent breach of a negative duty by injunction. Holton invokes the negative covenant of the contract, and relies on the cases in which breach of such covenants was enjoined.

In the case of *Kemble v. Kean,* 6 Simons Ch. 334 (1829), the English actor Kean broke his contract to act at Covent Garden in London and not to act elsewhere. The vice chancellor held he could not make Kean perform the affirmative covenant by sending him to the Fleet, and so would not restrain him by injunction from breaching the negative covenant. This decision was disapproved by the lord chancellor in the case of *Lumley v. Wagner,* 1 De Gex Mac. & G. 604 (1852). In that case Mlle. Johanna Wagner, *cantatrice* of the court of his majesty the king of Prussia, broke her contract to sing at a theater in London and not to sing elsewhere. The lord chancellor vindicated the power of the court of chancery to enjoin breach of the negative covenant, even although he could not compel performance of the affirmative covenant, and allowed injunction. The lord chancellor admitted he had no power to compel mademoiselle to sing, but he opined that if he enjoined her from singing elsewhere, she might be induced to keep her engagement. The lord chancellor did not know the lady. She did not sing in London.

At one period of the history of the United States everybody knew of Lajoie, the incomparable second baseman for Philadelphia, and a great all-around ball player. He broke his contract. The lower court denied injunction, and the supreme court reversed the judgment. The supreme court said that while Lajoie might not be the sun, he was a bright particular star in the baseball firmament, and while he could not be compelled to play on the Philadelphia team, he could be restrained from playing with any other club. (*Phila. Ball Club, Ltd., Appellant, v. Lajoie,* 202 Pa. St. 210.) This effort to induce performance by negative injunction also failed.

The foregoing were cases involving personal services of unique kind. To enjoin breach of contract for rendition of ordinary service would tend to commit to involuntary servitude. There are cases not involving personal service in which the object of relief by injunction

was to induce performance of affirmative covenants. All such cases may be left at one side. There is no doubt that injunction may be beneficially employed in aid of relief by specific performance, and there is a field for the use of injunction when specific performance may not be compelled. But the court is not concerned with such cases. The petition in this case was not drawn on the theory the contract contained a negative covenant, breach of which was to be enjoined, and the injunction was not granted on that theory. The purpose of the petition and of the judgment was to compel performance of all the covenants of the contract, and the principle stated in the opinion in *Smith v. Myers*, 130 Md. 64, applies:

"A suit for an injunction which seeks to accomplish all the purposes of a decree for specific performance is subject to the principles which apply to an application for the latter remedy, . . . ." (p. 67.)

The cities are now powerless to perform the contracts. They have no transmission lines, they have no distributing systems, the supplying of electric current to the cities and their inhabitants has been granted away, and the taking of electric current by the cities from Holton is an impossibility.

The public service commission approved the contracts of sale to the Kansas Power and Light Company, directed that the proceeds of sale be applied on outstanding obligations of the cities incurred in erecting or purchasing their plants, and directed that the balance be paid into the general revenue funds of the cities. The sales were for cash, except that the power and light company assumed payment of some bonds issued by Soldier. Presumably the sale prices have been paid, and the proceeds have been applied as directed. The approved contract with each city provided that the city would grant a twenty-year franchise to the purchaser to supply the city and its inhabitants with electric current. The franchises were granted, and Holton acquiesced in the situation thus created. The contracts between the Kansas Power and Light Company and Circleville and Mayetta were approved by the public service commission on respectively June 7, 1928, and November 13, 1928, and actions against those cities were not commenced until November 13, 1929. The contracts between the Kansas Power and Light Company and Soldier and Havensville were approved on respectively June 18, 1928, and January 18, 1929, and actions against those cities were not commenced until October 2, 1930. Under these circumstances, the court could not nullify what had been done and compel restora-

tion of the relations existing between the cities and Holton before the sales to the Kansas Power and Light Company had been consummated, either by injunction against breach of the negative covenant, or by direct action for specific performance.

The injunction runs against the Kansas Power and Light Company. There is no contention the Kansas Power and Light Company is an assignee, and it is not. It entered into its own arrangement with the cities. The contracts between the cities and the Kansas Power and Light Company were all in writing. Nothing whatever was assumed in any contract with respect to the Holton contract, and only two contained agreements to indemnify.

There is a contention in Holton's brief that the Kansas Power and Light company pleaded or admitted in its answers in the Mayetta and Circleville cases that it assumed performance of the Holton contracts. The pleading is set out above, and is susceptible of no such interpretation. The pleading was so framed that it denied assumption unless assumption were expressly admitted, and there was no such admission. The first defense was nonexistence of any obligation of the city under the Holton contract. The second defense was a sale approved by the public service commission, and that defense neither alleged nor admitted that any obligation remained incumbent on the city. The statement regarding holding the city harmless was a statement of the effect of a provision of the contract between the city and the Kansas Power and Light Company. The contract was produced in evidence. There was no uncertainty in its terms, and performance of the Holton contract was not assumed.

Having contracted with the cities to supply them with electric current, and having no physical connection with its own producing plant, the Kansas Power and Light Company paid bills for current delivered by Holton.

As indicated above, the Kansas Power and Light Company was careful not to bind itself in its contracts with the cities to fulfill any of the obligations of the Holton contracts. Therefore, in order that the Kansas Power and Light Company should be bound to Holton, it was necessary there should be a new contract between the Kansas Power and Light Company and Holton. There could be no contractual right on the part of Holton, and no contractual duty on the part of the Kansas Power and Light Company, unless the terms

of the right and duty were fixed by the parties. The manager of the Holton plant testified as follows:

"Q. You bill the power company instead of billing those cities? A. Yes.

"Q. There was nothing said one way or the other about it? A. No.

"Q. You just sent bills to the power company instead of sending them to each of these cities? A. Yes."

So Holton was proponent. It voluntarily sent bills to the Kansas Power and Light Company for current delivered. It did not consult the Kansas Power and Light Company, and did not indicate that anything more was involved than payment of the bills. The Kansas Power and Light Company paid the bills without indicating anything more than that it was paying the bills. What Holton had in mind is not material. That only is material which words or conduct of the Kansas Power and Light Company warranted Holton in believing, and the facts stated disclosed to Holton no recognition of obligation on the part of the Kansas Power and Light Company beyond the implied obligation to pay for what it got. There was no manifestation of assent to be bound for periods of years by all the terms of elaborate written contracts which had neither been assigned nor assumed. Whether the Kansas Power and Light Company incurred liability to Holton for inducing breach of the Holton contracts is not material in this action. The action and judgment were for specific performance of the contract, and there was no contract on the part of the Kansas Power and Light Company to be performed.

The foregoing renders it unnecessary to refer to various interesting subjects discussed in the briefs.

The judgment of the district court in each case is reversed, and the cause is remanded with direction to render judgment for defendants.

SLOAN, J., not sitting.