**CITY OF LOUISVILLE, Defendant-Appellant,**

v.

**ROCKWELL MANUFACTURING CO., Plaintiff-Appellee.**

No. 72–1612.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 12, 1973.

Decided June 27, 1973.

---

4. Reply brief for Intervenor, p. 15.

James E. Thornberry, Director of Law, Herbert Van Arsdale, II, Asst. Director of Law, Bert T. Combs, Richard W. Iler, Louisville, Ky., for defendant-appellant; Tarrant, Combs, Blackwell & Bullitt, Louisville, Ky., of counsel.

Joseph E. Stopher, Edward H. Stopher, Boehl, Stopher, Graves & Deindoerfer, Louisville, Ky., for plaintiff-appellee.

Before EDWARDS and PECK, Circuit Judges, and WILSON, District Judge.*

WILSON, District Judge.

The City of Louisville, Kentucky, has appealed from the decision of the District Court awarding damages to Rockwell Manufacturing Co. for breach of a contract to purchase parking meters. The appellant contends that the trial court was in error both in finding that an enforcible agreement existed between the parties and in excluding evidence relevant to this finding. Further, the trial court misconstrued the nature and provisions of the agreement, so it is con-

* The Honorable Frank W. Wilson, Chief Judge, United States District Court for the Eastern District of Tennessee, sitting by designation.

tended. Finally, errors are complained of in the award of damages.

This case was tried to the District Court sitting without a jury. It is before this Court upon the findings of fact and conclusions of law of the trial court and upon the trial record made in that court. Accordingly, the appellate review of the trial court's findings of fact must be governed by the rule that such findings shall not be set aside unless clearly erroneous (Rule 52, F.R.Civ.P.). The trial court's conclusions of law, including the interpretation of written contracts, are, of course, subject to independent appellate determination. Cordovan Associates, Inc. v. Dayton Rubber Co., 290 F.2d 858 (6th Cir. 1961); University Hills, Inc. v. Patton, 427 F.2d 1094 (6th Cir. 1970).

## I

Although, as reflected in the trial record, considerable testimony was devoted to matters in the nature of detail background and interpretation, the essential facts to this litigation may be summarized as follows. Motivated by a need for revenue to finance a municipal redevelopment program known as the Riverfront Development Project, the City of Louisville solicited bids in September of 1969 for the purchase and installation of approximately 7650 parking meters. The solicitation followed a survey that recommended the installation of approximately 7425 parking meters in designated areas as a means of providing the needed revenues. Two bids were submitted, one by Rockwell Manufacturing Co., the plaintiff below, and the other by a competing manufacturer, Duncan Industries, Inc. The Rockwell bid in addition to meeting the details of the bid solicitation, quoted a price of $54.20 per meter, plus a price of $8.48 for installation of each meter. The Duncan bid quoted a price of $48.62 per meter, but omitted any quotation for installation. It appears that the Duncan bid also failed to meet the bid specification in at least one other respect. Upon evaluation of the bids by the appropriate

municipal authorities, it was determined to award a contract to Rockwell as the only bidder meeting the specifications. Upon November 29, 1969, an agreement was duly entered into between the City and Rockwell for the purchase of parking meters, the terms of the agreement insofar as essential to the issues in this lawsuit being as follows:

"Annual Contract thru June 30, 1970 to furnish part of the City's requirements of parking meters, coin boxes and repair parts, in accordance with the following and specifications which were attached to Proposal P–41–58 and which are made a part thereof.

APPROXIMATELY:

7650 Parking Meters and Coin Boxes to be installed in accordance with the aforementioned specifications.

UNIT PRICES AS FOLLOWS:

Parking Meter, per each, including one (1) Security locked coin box and time wipe off lock.___$54.20 Installation of Parking Meter, per each _____ 8.48

\*       \*       \*       \*       \*       \*

RENEWAL OPTION:

The Louisville-Jefferson County Purchasing Director will reserve the right to renew this Contract for one (1) year, and from year-to-year thereafter, if he considers such renewal to be to the City's and/or County's advantage and if same is agreeable to the Contractor.

\*       \*       \*       \*       \*       \*

Delivery to be in accordance with schedule "E" which was made a part of bid Proposal P–4158, and which is made a part hereof."

The delivery schedule "E" referred to above was as follows:

"Installation will be made in accordance with the following schedule:

"First 1,000 meters to be installed within 30 days from date of receipt of City's purchase order, complete specifications for the meters and detailed locations where each meter is to be installed.

"Balance of meters to be installed at the approximate rate of 1,000 meters every two weeks until completion.

"Final installation to be completed within 128 days after receipt of purchase order" (A. 429–430)."

Upon December 8, 1969, the Director of Traffic Engineering for the City, acting under the above agreement, submitted an order to Rockwell for delivery to the City of 1,000 meters "not installed". By letter of December 15, 1969, an official of Rockwell acknowledged receipt of the order. In this letter he returned certain specification sheets forwarded with the order and requested that they be authenticated by signature and that this practice of authentication be followed in the future. He further stated that he would not consider the 30 day delivery period called for in Schedule E to commence until receipt of the specifications complete. [In the same letter he also acknowledged that an understanding had been reached with the City that the delivery schedule "as originally called for in Schedule E will not be adhered to" on future orders]

In the meanwhile, a change of administration occurred in Louisville with a new mayor taking office two days after the execution of the November 29 agreement with Rockwell. Under date of December 22, 1969, the new Director of Traffic Engineering wrote to a sales representative of Rockwell "to temporarily hold up delivery of our initial order of 1,000 meters". There appears to have been some delay in this correspondence reaching the appropriate official in Rockwell, but its receipt was acknowledged on January 5, 1970. By letter on this date the City was advised that Rockwell had completed the manufacture of the initial order of 1,000 meters and that they were packaged, ready for shipment, but that Rockwell would hold up on delivery of these meters pending further instructions.

Further delivery instructions were never issued by the City. On the contrary, soon after the above correspondence the new City Law Director advised Rockwell's attorney that he considered the agreement with Rockwell null and void and had so advised the appropriate city officials. He gave as his reasons for this conclusion that (a) the City-County Purchasing Agent was without authority to solicit the bid, (b) that Rockwell was not the "lowest and best bidder" as required by Kentucky law, and (c) that the agreement was "executory" and as such unenforcible. Acting upon this advice the City repudiated its agreement with Rockwell and proceeded upon May 8, 1970, to solicit new bids for "approximately 6,000" parking meters. Duncan Industries, Inc. was the successful bidder upon this solicitation and upon June 4, 1970, a contract was awarded to Duncan for "approximately 6,000" meters at $46.92 per meter, with the installation to be performed by the City. The contract with Duncan provided that it was an "annual contract to furnish part of the City's requirement of parking meters . . . For the period from July 1, 1970, through June 30, 1971. Approximately 6,000 parking meters . . ." The City proceeded to order parking meters from Duncan in accordance with the following schedule:

| | |
|---|---|
| July 17, 1970 | — 2,000 meters |
| August 19, 1970 | — 1,000 meters |
| December 10, 1970 | — 1,000 meters |
| January 25, 1971 | — 450 meters |
| April 5, 1971 | — 800 meters |

Of the foregoing meters purchased from Duncan, a total of 4362 were installed by August 1971 to complete the City's parking meter project and 888 were retained in the municipal warehouse.

In the meanwhile, the City having repudiated its contract with Rockwell, this lawsuit was filed upon May 5, 1970, seeking damages for breach of contract. Upon the trial Rockwell's manager testified that the 1,000 meters manufactured pursuant to the City's December 1969 order remained unsold and unsalable as

of the time of the trial and that Rockwell was claiming the full sales price of $54.20 upon each of these meters. With regard to the meters not manufactured, Rockwell's cost accountant testified that on the bid price of $54.20 per meter Rockwell's labor, materials and freight costs totaled $26.25 per meter, leaving a loss of profit (including overhead) of $27.95 per meter. No evidence to the contrary was introduced as to any of these damage claims.

Upon this state of the record, the District Court concluded that the November 29, 1969 agreement constituted an enforcible contract, that the City had breached the contract and that Rockwell was entitled to recover the purchase price of $54,200 (1,000 meters x $54.20) upon the 1,000 meters manufactured by it and to recover the further sum of $118,787.50 (4250 meters x $27.95) upon the remaining number of meters ordered by the City from Duncan during a one year period under that contract. (Additionally, the District Court awarded Rockwell interest in the sum of $535.60 upon monies deposited with the City to assure performance by Rockwell. This item is not in dispute upon this appeal.)

## II

The initial contention of the City upon this appeal is that the trial court was in error in concluding that an enforcible agreement ever arose between the parties. Rather, it is contended that the agreement was so unreasonable and unconscionable as to be unenforcible against a municipal corporation. Further, it is contended that the agreement is ambiguous and uncertain and that when it is properly construed it is only an open end offer by Rockwell to sell parking meters to the City at a stated price for a stated time. As regards the 1,000 meters for which an order was placed, it is contended that no effective order was placed as the specification documents were returned by Rockwell and never resubmitted by the City.

■ Before consideration is given to these contentions, one other matter should be noticed and disposed of. That is the contention by Louisville that the trial court improperly precluded it from examining a witness upon the relevant merits of Rockwell's meter as compared with the Duncan meter. Presumably the City sought to introduce this evidence in support of its contention that the Rockwell bid was not the "lowest and best" bid, at least pricewise if not otherwise. The fallacy of the appellant's position in this regard is readily apparent, however, when it is recalled that the undisputed evidence shows that the Duncan bid failed to meet all terms of the specifications and that the Rockwell was the only bid to meet the specifications. In fact, in seeking to introduce the testimony now complained of as having been excluded, the City conceded that the Duncan meter did not meet the specifications. No relevant purpose could have been served by comparing a meter that met specifications with one that did not meet specifications.

■■ Returning to the contention of Louisville that the agreement of November 29, 1969, was so unreasonable and unconscionable as to be unenforcible against a municipal corporation, it is significant to note that the trial court specifically found that there was no evidence in the record of any fraud or malfeasance on the part of anyone either in the solicitation of bids, the bidding, or the awarding of the contract. This finding would appear to be in accord with the record. It is certainly not clearly erroneous. Apart from the contention of the City that the contract was negotiated just prior to a change in city administrations, a matter the City apparently contends is a badge of fraud, the City's principal contention is that the high rate of profit claimed as damages by Rockwell renders the agreement unreasonable and unconscionable. Apart from the fact that the profit referred to ($27.95 per meter) is a gross profit figure and not a net profit figure, and apart from the fact that the Rockwell bid was the only bid to meet the City's specifications, it appears settled law in

Kentucky that the courts will intercede in the letting of municipal contracts to the "lowest and best bidder" only where the resulting agreement is shown to have been arbitrarily, corruptly or fraudulently let. See Trapp v. City of Newport, 115 Ky. 840, 74 S.W. 1109 (1903); Campbell v. Southern Bit. Co. and City of Ashland, 32 Ky.L.R. 799, 106 S.W. 1189; Groover v. City of Irvine, 222 Ky. 366, 30 S.W. 904; Baskett v. Davis, 311 Ky. 13, 223 S.W.2d 168 (1949). As noted by the trial court, and as supported by the trial record, "The record is void of any evidence tending to suggest . . ." fraud or malfeasance on the part of either party in this case.

■ The principal thrust of the appellant's argument appears to be directed to the wording of the agreement itself, and to the contention that the agreement, properly construed, commits the City to no purchase obligation, but is rather in the nature of an option, committing Rockwell to an "open end offer" to sell at a stated price for a stated time. In support of this contention it is emphasized that the agreement dated November 29, 1969, provides that it is an "annual contract through June 30, 1970," that Rockwell is to furnish only "part of the City's requirement for parking meters", the number to be furnished being "approximately 7650 parking meters" and that delivery is to be made only "after receipt of a purchase order" from the City. While it does appear that these matters create a degree of indefiniteness and ambiguity in the agreement, in the light of the full record in this case it does not appear that they render the agreement only an option or an "open end offer", leaving the City wholly uncommitted until such time as it may elect to place an order. While such an argument could better have been advanced prior to the adoption of the Uniform Commercial Code in Kentucky, it would appear to have no merit subsequent to the adoption of that code. For the Uniform Commercial Code, adopted in Kentucky effective as of July 1, 1960,

is more liberal than prior law in permitting open terms in a sales contract and in not requiring complete certainty or definiteness. Under the code, even though one or more terms are left open, a contract for sale does not fail for indefiniteness or lack of mutuality if the parties have intended to make a contract and there is a reasonably certain basis for granting appropriate relief. [K.R.S. 355.2-204(3)] Moreover, Section 2-306(1) of the Uniform Commercial Code [K.R.S. 355.2-306(1)] provides in pertinent part:

"A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith . . ."

Under this provision municipal "requirements" is not too indefinite a term, since it is held to mean the actual good faith requirements of the City when dealing according to commercial standards of fairness. The further provision for furnishing "part" of the City's requirements likewise does not render the agreement illusory or lacking in mutuality, both in light of the full record upon the trial and in light of the further provision in the agreement for furnishing "approximately 7650" parking meters. The word "approximately" when used in this context merely indicates that precision in quantity is not intended, but rather a margin is intended either for excess or deficiency in the quantity stated. The degree of variation thus made permissible depends upon the facts of the particular case. See Harten v. Loffler, 212 U.S. 397, 29 S.Ct. 351, 53 L.Ed. 568 (1909). See also Section 2-306(1) of the Uniform Commercial Code [K.R.S. 355.2-306(1)] wherein it is provided that in a requirements contract no quantity unreasonably disproportionate to a stated estimate may be tendered or demanded.

Although this Court cannot concur in the conclusion of the trial court that the subject agreement is without ambiguity, it is the opinion of this Court that such ambiguity as exists in the agreement, in

the light of the record, must be resolved in favor of the conclusion that the City contracted to purchase of Rockwell such parking meters as would be required by it during the contract term if the City acted in good faith to carry out its contemplated parking meter installation project. The good faith and commercial fairness standards of the Uniform Commercial Code hereinabove referred to require this result. In this regard it is appropriate to note that each Kentucky case cited by the appellant in support of its contentions for a different conclusion predates the adoption of the Uniform Commercial Code in that state.

■ Before turning to the damage issues in this lawsuit, there remains to consider the appellant's contention that the 1,000 meter order placed by the City in December of 1969 was ineffective as the specification documents included therewith were returned by Rockwell for signature authentication and were never resubmitted by the City. The trial judge concluded that Rockwell was justified in relying upon the order and in proceeding promptly to manufacture the meters for delivery in accordance with its 30 day delivery schedule. He further concluded that the return of the specifications for signing did not constitute a repudiation of the order by Rockwell. Suffice it to say that to the extent these conclusions constitute findings of fact, they are supported by the trial record. To the extent that they constitute conclusion of law, we are in accord with them.

■ Turning to the damage issues in the lawsuit, the initial claim for damage is with respect to the 1,000 meters hereinabove just referred to. The record reflects that these meters were manufactured pursuant to order, but delivery was declined when the contract was repudiated by the City. They remain unsold and unsalable, according to the only testimony in the record. Upon this state of the record, Rockwell claims as damage the contract price of $54.20 per meter. The trial court found in favor of this claim and it appears rightfully

so. The Uniform Commercial Code permits the seller to recover the price of goods identified in the contract if the seller is unable after reasonable effort to resell them at a reasonable price, or the circumstances reasonably indicate that such an effort will be unavailing [K.R.S. 355.2–709(1)(b)]. A matter unnoticed in the record below, however, is that where the seller sues for the price, he must hold for the buyer any goods that have been identified to the contract and are still in his control, except that if resale at a reasonable price becomes possible, he may resell them at any time prior to collection of the judgment and the net proceeds of the sale must be credited to the buyer. Payment of the judgment entitles the buyer to delivery of any goods not resold and credited as stated above [K.R.S. 355.2–709(2)].

The final element of damage here in dispute is the trial court's award of damages in the further sum of $118,787.50, representing Rockwell's claim for profits of $27.95 per meter upon 4250 meters.

The figure $27.95 is the evidence offered by Rockwell as the gross profit (including overhead) it would have made upon each meter sold under its contract with the City. It is the only evidence in the record upon this claim. While $27.95 does not purport to be a net profit figure, a requirement sometimes followed prior to the Uniform Commercial Code, it is a correct figure to use in determining a loss of profits claim under the Uniform Commercial Code. With regard to a damage claim for loss of profits, Section 2–708(2) of the Uniform Commercial Code [K.R.S. 355.2–708(2)] permits recovery of the profit, including reasonable overhead, which the seller would have made from a full performance by the buyer.

The figure of 4250 used as a multiplier by the trial court represents 1,000 less than the number of meters purchased in the succeeding one year period by the City under the Duncan contract, the total of such purchases being in the

sum of 5250 meters. The figure of 5250 meters was accepted by the trial court as the good faith annual parking meter requirements of the City, that is, the number of meters the City would have required under the Rockwell contract had the City performed in good faith under that contract.

With but one exception this conclusion would appear to be correct. Having found that the City breached its contract with Rockwell by failing to purchase its good faith parking meter requirements during the period of that contract, it is appropriate to look to the City's parking meter purchases from any other source during some relevant and comparable time period as a method of establishing the City's good faith requirements under the Rockwell contract. That is, upon it appearing that the City withheld from purchasing its good faith meter requirements during the period of the Rockwell contract, it would be proper in establishing such meter requirements to look to a comparable succeeding period in which the City was purchasing its meter requirements in good faith. The only error committed by the trial court in this regard was that it failed to look to a period of time comparable to that covered in the Rockwell contract. Whereas the Rockwell contract was in fact a seven month contract (although stated at one point to be an "annual contract"), in establishing the City's good faith meter requirements under the Rockwell contract the trial court looked to the meter purchases made by the City over the succeeding twelve month period. During the first seven month period under the Duncan contract (July 1, 1970 thru January 31, 1971) the City purchased a total of 4450 meters (800 additional meters having been purchased on April 5, 1971, to accomplish a twelve month total of 5250 meters).

The correct calculation of Rockwell's loss of profits claim would accordingly be in the sum of $96,427.50 ($27.95 x 3450 meters), rather than the sum of $118,787.50 ($27.95 x 4250 meters).

The decision of the trial court will be affirmed in part and reversed in part. This case will be remanded for the entry of a judgment in accordance with this opinion.