**PROPANE INDUSTRIAL, INC.,**
Plaintiff,

v.

**GENERAL MOTORS CORPORATION,**
Defendant.

Civ. A. No. 74CV375–W–3.

United States District Court,
W. D. Missouri, W. D.

March 3, 1977.

Robert F. Deis, Moore, Lay & Deis, Platte City, Mo., for plaintiff.

Paul Scott Kelly, Jr., Gage & Tucker, Kansas City, Mo., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL JUDGMENT IN FAVOR OF PLAINTIFF

WILLIAM H. BECKER, Chief Judge.

Plaintiff, Propane Industrial, Inc., brought this action to recover the sum of $18,276.62 allegedly due and owing by defendant, General Motors Corporation, for the purchase of 75,572 gallons of propane delivered by plaintiff on December 31, 1973, and January 2 and 3, 1974. Plaintiff charged defendant $0.4048 per gallon for the propane, for a total of $30,591.54 (and sales tax of $917.75) which plaintiff contends was the reasonable price. Defendant has paid plaintiff the sum of $0.17 per gallon, or $12,847.25, and $385.42 sales tax. Defendant raises as a defense, set-off and counterclaim provisions of a contract alleged to have been entered into between plaintiff and defendant in March, 1973.

The pretrial proceedings have been completed. Pretrial Order No. 2, including a stipulation of all uncontroverted material facts, has been filed. The parties have each filed a brief setting forth their respective factual and legal contentions. Neither party desires a jury trial.

On the basis of the stipulation of uncontroverted facts, the exhibits, and designated portions of depositions, which the parties have stipulated can be considered as admissions of the deponents as agents of the parties, the following findings of fact and conclusions of law are made.

### I. Findings of Fact.

Plaintiff Propane Industrial, Inc. is a Missouri corporation, having its principal place of business in Kearney, Missouri. At all times material, plaintiff was engaged in the sale and distribution of propane, a liquefied petroleum gas. At all times material, James E. Ferrell (hereinafter "Ferrell") was the president and principal stockholder of plaintiff, and was authorized to enter into and to execute contracts on behalf of plaintiff.

Defendant General Motors Corporation is a Delaware corporation, having its principal place of business in the State of Michigan. Defendant owns and operates an assembly plant at 100 Kindelberger Road, Kansas City, Kansas (hereinafter "Fairfax plant"). At all times material, E. M. Ironsmith (hereinafter "Ironsmith") was the purchasing agent at defendant's Fairfax plant, and was authorized by defendant to make contracts for the purchase and procurement of goods and supplies for the Fairfax plant.

The Fairfax plant ordinarily uses natural gas for heating during the winter. The primary supplier of natural gas to the plant is the Gas Service Company, a public utility. However, the Gas Service Company periodically interrupts the flow of natural gas to the plant, requiring the defendant to maintain a standby supply of propane for use at the plant when the supply of natural gas is interrupted.

On March 9, 1973, Ferrell, by letter, advised Ironsmith of the terms upon which plaintiff would supply propane to the Fairfax plant for the September 1, 1973 to April 30, 1974 heating season. The letter stated:

We will agree to supply propane to your facility during the 1973–1974 winter standby season (September, 1973 through April, 1974) as follows:

PRICE: $.17 per gallon guaranteed firm f. o. b. your plant location.

CONTRACT VOLUME: 500,000 gallons

MONTHLY MAXIMUM DELIVERY VOLUME: 250,000 gallons

WEEKLY MAXIMUM DELIVERY VOLUME: 10 transport loads

DAILY MAXIMUM DELIVERY VOLUME: 2 transport loads

TERMS: Net 25th Instant 10th Prox

This product will be delivered via our own transport trucks from the MAPCC pipeline terminal at Kearney, Missouri. This offer expires March 23, 1973.

On March 21, 1973, after his receipt of the March 9, 1973 letter from Ferrell, Ironsmith issued purchase order no. KC–33109.[1] This purchase order was on a General Motors Corporation form, and provided in pertinent part:

| Description | Code No. | Price |
|---|---|---|
| To cover a possible requirement of (500,000) gallons of propane to be used as standby fuel at this Plant during the Heating Season from September 1, 1973 through April 30, 1974. | | $.17 Gallon Firm Price |

By the acceptance and acknowledgment of this Purchase Order, Vendor guarantees standby propane availability of the above quantity during the heating season to be delivered in accordance with the following:

A. 250,000 gallons maximum monthly delivery.

B. Ten (10) transport loads as maximum delivery in one week.

C. Two (2) transport loads as maximum delivery in one day.

| Description | Code No. | Price |
|---|---|---|
| D. Delivery within 24 hours of Release on "As Required" basis. | | |
| E. Invoices will be issued only for quantities released from now to (500,000) gallons. | | |

In accordance with Proposal dated 3/9/73.

The purchase order further provided for delivery of propane by plaintiff only "as released." Finally, the purchase order provided that

[t]his order, including the terms and conditions on the face and reverse side hereof, contains the complete and final agreement between Buyer [defendant] and Seller [plaintiff] and no other agreement in any way modifying any of said terms and conditions will be binding upon Buyer unless made in writing and signed by Buyer's authorized representative.

The purchase order expressly provided that its terms were to be governed by the law of the state "from which [the] order issues", which is the State of Kansas.

Several copies of the purchase order were made. One copy was signed on behalf of defendant by Ironsmith on March 21, 1973. This copy was retained by plaintiff. A second copy was signed on behalf of plaintiff by Ferrell on March 24, 1973. This copy was retained by defendant.

The factual and commercial context in which purchase order no. KC–33109 was executed is material to construction of the terms of the order. Plaintiff had supplied standby propane to the Fairfax plant since approximately 1970. In each of the years prior to March, 1973, a purchase order form similar to purchase order no. KC–33109 was issued and executed by the parties. However, prior to March, 1973, plaintiff was not the sole supplier of propane to the Fairfax plant of defendant. For example, for the 1972–1973 heating season, defendant executed purchase orders similar to purchase order no. KC–33109 with both Consolidated Fuel Oil Company and Modern Gas Compa-

1. According to the deposition testimony of Ironsmith, the policy of defendant was to issue a single purchase order to a supplier for the desired commodity which covered the entire sea-

son. However, deliveries against the purchase order were only made when defendant issued a release for a specific amount of the commodity.

ny in addition to plaintiff. And during that season defendant obtained propane from all three suppliers in the following amounts: 115,409 gallons from Consolidated; 182,146 gallons from Modern; and 576,277 gallons from plaintiff. For the 1973–1974 season, for which purchase order no. KC–33109 was issued, defendant also executed a similar purchase order with Enterprise Products Company for propane requirements from November 1, 1973 through March 31, 1974, under which defendant agreed to purchase 1,600,000 gallons at $0.15463 per gallon, with an option to be relieved of the obligation to purchase by payment of $0.035 per gallon or to delay delivery until the 1974–1975 heating season by payment of an additional $0.045 per gallon, plus freight charges.

On July 30, 1973, before any "releases" against purchase order no. KC–33109 had been issued by defendant, Ferrell advised Ironsmith by letter that

> [d]ue to serious shortages of all fuels, of which propane gas is by no means an exception, we are unable to fulfill our contract with you as outlined in your PO KC33109.
>
> We can obtain the propane but at a much greater cost than what our contract price is. This notification is being given so that you may attempt to find another supplier. Also, this gives ample warning of non-compliance.

By letter dated August 23, 1973, Ironsmith acknowledged receipt of Ferrell's letter, but stated that

> [s]ince this contract was executed in good faith, we expect you to fulfill your obligation in accordance with the terms and conditions stated therein.

On August 25, 1973, Ferrell by letter advised Ironsmith that "the facts as outlined in my letter to you of July 30, 1973 have not changed."

Despite Ferrell's July 30, 1973 letter, on September 11, 1973, defendant issued a re-

lease (order for a definite amount) against purchase order no. KC–33109 for 8,000 gallons of propane. On September 19, 1973, Ferrell advised Ironsmith that under a proposed mandatory allocation program concerning propane being considered by the federal government, and with which the government had requested voluntary compliance prior to enactment, defendant was a non-priority user "and until all priority customers' needs are fulfilled, we cannot deliver to you."

On October 3, 1973, the Energy Policy Office Propane Allocation Program went into effect.[2] These regulations were followed by procedural rules for administration of the program on October 24, 1973.[3] Under this program, propane suppliers were directed to supply "priority customers" as defined by the regulations before supplying non-priority users. Special provision was made for persons who suffered "exceptional hardships" because of the mandatory allocation to priority users.

Defendant's Fairfax plant did not qualify as a priority user under the program. Nevertheless, on November 1, 1973, Ironsmith advised Ferrell that the anticipated propane requirements of the Fairfax plant for the 1973–1974 heating season would be:

| | |
|---|---|
| December, 1973 | 261,000 gallons |
| January, 1974 | 292,000 gallons |
| February, 1974 | 201,000 gallons |
| March, 1974 | 75,000 gallons |
| April, 1974 | 51,000 gallons. |

Ferrell did not respond in writing to Ironsmith's letter, but advised Ironsmith by telephone that he had submitted Ironsmith's request to the Kansas City Office of the Energy Policy Office for consideration and that no propane was available for the Fairfax plant at that time.

On November 21, 1973, defendant filed a request with the Office of Oil and Gas—Petroleum Allocation Division of the United States Department of the Interior for an order providing additional amounts of propane to the Fairfax plant pursuant to the hardship provisions of the Propane Alloca-

---

**2.** 38 Federal Register 27397–398 (October 3, 1973).

**3.** 38 Federal Register 29330–336 (October 24, 1973).

tion Program. On January 2, 1974, the Regional Office of the Federal Energy Administration granted the request and directed plaintiff

. . . to furnish, *on financial terms acceptable to both parties*, 171,000 gallons of propane to the customer [defendant] for the period from January 1, 1974 to February 1, 1974, from supplies not required to meet priority requirements of priority customers. (Emphasis added)

The Regional Office of the Federal Energy Administration apparently advised plaintiff by telephone prior to December 31, 1973 that the hardship request of defendant would be granted, and had requested plaintiff to make delivery of the propane immediately. Accordingly, on December 31, 1973 and January 2 and 3, 1974, plaintiff delivered to defendant at its Fairfax plant 75,-572 gallons of propane. There had been no further discussion of price between plaintiff and defendant prior to delivery.

Following the delivery, plaintiff, by invoice, charged defendant $0.4048 per gallon for the 75,572 gallons delivered. This per gallon price was based on a weighted cost of the propane to plaintiff of $0.35325 per gallon, the cost of transportation from Kearney, Missouri to Fairfax, Kansas of $0.0062 per gallon, a profit of $0.04535 per gallon, and taxes.

Defendant paid plaintiff for this delivery at the rate of $0.17 per gallon on the grounds that the purchase price of the propane was governed by purchase order no. KC–33109.

The difference between the amount charged by plaintiff and the amount paid by defendant is $18,276.62.

## II. *Conclusions of Law.*

### A. *Jurisdiction.*

Jurisdiction exists under Section 1332, Title 28, United States Code, because the parties are citizens of different states and the amount in controversy exceeds $10,000.00 exclusive of interest and costs.

### B. *Merits.*

#### (1) Existence of a Contract.

The first issue to be determined is whether purchase order no. KC–33109 is a binding, enforceable contract between plaintiff and defendant. Only if a determination is made that the purchase order constitutes a binding contract will it be necessary to determine what effect, if any, enactment of the Propane Allocation Program and the change in market conditions had on the alleged contract.

Defendant contends that purchase order no. KC–33109 constitutes a valid, binding, and enforceable "requirements contract." Plaintiff contends that purchase order no. KC–33109 does not constitute a valid requirements contract because the purchase order does not contain a promise by defendant to purchase propane exclusively from plaintiff and therefore lacks the elements of mutuality and consideration necessary to a binding contract.

The purchase order expressly provides that its terms are to be governed according to the law of the state from which the order issues. Therefore, whether the purchase order constitutes a binding requirements contract must be determined according to the law of the State of Kansas.

A "requirements" contract is generally defined as a contract in which the seller promises to supply all the specific goods or services which the buyer may need during a certain period at an agreed price in exchange for the promise of the buyer to obtain his required goods or services exclusively from the seller. Although the buyer does not agree to purchase any specific amount, the requisite mutuality and consideration for a valid contract is found in the legal detriment incurred by the buyer in relinquishing his right to purchase from all others except from the seller. *Shader Contractors, Inc. v. United States*, 276 F.2d 1, 5, 149 Ct.Cl. 535 (1960); *Lowell O. West Lumber Sales v. United States*, 270 F.2d 12 (9th Cir. 1959); *Oregon Plywood Sales Corp. v. Sutherlin Plywood Corp.*, 246 F.2d 466 (9th Cir. 1957). *See generally*: 1A Corbin *On*

*Contracts*, Section 157 (2nd 2d. 1963); 1 Williston *On Contracts*, Section 104A (3rd ed. 1957); Note, "Requirements Contracts: Problems of Drafting and Construction", 78 Harv.L.Rev. 1212 (1965); Annotation, "Construction and Effect of Contract For Sale of Commodity to Fill Buyer's Requirements", 26 A.L.R.2d 1099 (1952); Annotation, "Mutuality and Enforceability of Contract to Furnish Another With His Needs, Wants, Desires, Requirements and the Like of Certain Commodities", 26 A.L.R.2d 1139 (1952).

The State of Kansas has by statute recognized requirements contracts as valid, binding and enforceable despite the uncertainty of the extent of the obligation through adoption of Section 2–306 of the Uniform Commercial Code, which became effective in Kansas January 1, 1966. Section 84–2–306, Kansas Statutes Annotated.[4] Even prior to the adoption of Section 84–2–306, K.S.A., the courts of the State of Kansas had judicially recognized the validity of requirements contracts. *See Southwest Kansas Oil & Gas Co. v. Argus Pipe Line Co.,* 141 Kan. 287, 39 P.2d 906 (1935); *City of Holton v. Kansas Power & Light Co.,* 135 Kan. 58, 9 P.2d 675 (1932); *Griffin v. Oklahoma National Gas Corp.,* 37 F.2d 545 (10th Cir. 1930).

An essential element of the valid requirements contract is the promise of the buyer to purchase exclusively from the seller.[5] In the absence of such a promise, or some other form of consideration flowing from the buyer to the seller, the requisite mutuality and consideration for a requirements contract is absent. *See: Hutchinson Gas & Fuel Co. v. Wichita Natural Gas Co.,* 267 F. 35 (8th Cir. 1920) [Kansas law]; *Cold Blast Transp. Co. v. Kansas City Bolt & Nut Co.,* 114 F. 77 (8th Cir. 1902) [Kansas law]. The promise of the seller becomes merely an invitation for orders and a contract is not consummated until an order for a specific amount is made by the buyer. *See:* 1A Corbin *On Contracts,* Section 157 (2nd ed. 1963); *Streich v. General Motors Corp.,* 5 Ill.App.2d 485, 126 N.E.2d 389 (1955); Annotation, 26 A.L.R.2d 1139, 1148.

However, an *express* promise by the buyer to purchase exclusively from the seller is not always required. In construing a contract in which only the seller has agreed to sell, a court may find an *implied* reciprocal promise on the part of the buyer to purchase exclusively from the seller, at least when it is apparent that a binding contract was intended. *City of Holton v. Kansas Power & Light, supra; Hutchinson Gas & Fuel Co. v. Wichita Natural Gas Co., supra; Cold Blast Transp. Co. v. Kansas City Bolt & Nut Co., supra. See generally:* Annotation, 26 A.L.R.2d 1139, 1149.

The parties are in substantial agreement with the foregoing principles of the law of contracts. The disagreement between the parties is on the question whether purchase order no KC–33109 contains an express or implied promise by defendant to purchase propane exclusively from plaintiff up to the specified amounts.

The purchase order does not contain an express promise by defendant to purchase exclusively from plaintiff. Further, such a promise cannot be implied solely from the terms of the purchase order because of the ambiguity of the language employed. The purchase order states that it is to cover a "*possible* requirement" (emphasis supplied), and that delivery is to be made "within 24 hours of Release on 'As Required' basis." A promise to purchase

---

4. Section 84–2–306(1), K.S.A., provides:

(1) A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

5. The requirement of exclusivity does not mean that the buyer must contract to purchase *all* his requirements from a particular seller. The requirement of exclusivity can be satisfied if the buyer contracts to purchase *up to a specified amount* exclusively from the seller. *City of Louisville v. Rockwell Manufacturing Company,* 482 F.2d 159, 164 (6th Cir. 1973).

exclusively from plaintiff cannot be implied solely from use of the terms "requirement" and "as required" because "requirement" can mean either "all needed by defendant for the Fairfax plant" or only "all desired by defendant from plaintiff." "[T]he word 'requirements' . . . is not a word of art" having the meaning attributed to it by the defendant. *William C. Atwater & Co. v. Terminal Coal Corporation,* 115 F.2d 887, 888 (1st Cir. 1940). *See also: Armstrong Paint & Varnish Works v. Continental Can Co.,* 301 Ill. 102, 133 N.E. 711 (1921). Had defendant intended to bind itself to purchase exclusively from plaintiff, it could have made such a promise clear on the face of the order when the defendant drafted the order.

■ When the express terms of an alleged contract are ambiguous, in the sense that the terms may be understood to reach two or more possible meanings, extrinsic evidence of the circumstances surrounding execution of the alleged contract may be considered. Section 84–2–202(a), Kansas Statutes Annotated;[6] *Hamann v. Crouch,* 211 Kan. 852, 508 P.2d 968 (1973); *Mobile Acres, Inc. v. Kurata,* 211 Kan. 833, 508 P.2d 889 (1973); *Northern Natural Gas Co. v. Grounds,* 292 F.Supp. 619 (D.Kan.1968); *Southwest Kansas Oil & Gas Co. v. Argus Pipe Line Co., supra.*

■ When the prior course of dealing between plaintiff and defendant, and the material circumstances in 1973 are considered, it clearly appears that defendant did not intend to bind itself to purchase its initial requirement of 500,000 gallons of propane exclusively f. om plaintiff. For example, defendant and plaintiff had executed a similar purchase order for the 1972–1973 season. Nevertheless, defendant issued similar purchase orders to Consolidated Fuel Oil Co. and Modern Gas, Inc. for the same season and in fact obtained pro-

pane from both. Clearly, the parties, and particularly the defendant, did not consider that the purchase order bound defendant to purchase exclusively from plaintiff.

Defendant followed the same custom for the 1973-1974 season by issuing purchase orders for propane to both plaintiff and the Enterprise Products Company. Again, the implication is clear that defendant did not intend to bind itself to purchasing propane solely from plaintiff if more advantageous terms or better service could be obtained from another supplier. Defendant contends that the purchase order with the Enterprise Products Company would not have interfered with performance of the alleged contract with plaintiff because the Enterprise purchase order was a firm order for a specified number of gallons, included only the months of October through March (purchase order no. KC–33109 covered September through April), and did not require defendant to take all of the propane during the 1973–1974 season since defendant could pay Enterprise an additional $0.045 per gallon and take delivery during the 1974–1975 season. However, the fact remains that defendant might have obtained its total requirements from the Enterprise Products Company without any obligation to issue any releases against purchase order no. KC–33109 had it chosen to do so.

Defendant further contends that even if purchase order no. KC–33109 did not expressly bind it to purchase propane exclusively from plaintiff for the 1973–1974 season, the prior dealings between plaintiff and defendant, including defendant's purchase of 576,277 gallons of propane from plaintiff during the 1972–1973 season, support a finding that defendant made an implied promise to request plaintiff to deliver its requirements up to 500,000 gallons during the 1973–1974 season. However, there is insufficient evidence of prior dealing or

6. Section 84–2–202(a), K.S.A., provides:

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of

any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

    (a) by course of dealing or usage of trade (§ 84–1–205) or by course of performance (§ 84–2–208).

other circumstances upon which to base a finding that such an implied promise was made. The fact that defendant purchased 576,277 gallons from plaintiff during the previous season does not constitute proof of a sufficient course of dealing, especially considering the fact that defendant also purchased propane from other suppliers during that season. That purchase may have resulted from market factors that vary from season to season. Plaintiff could not expect defendant to purchase any propane from it during the 1973–1974 season if defendant obtained more favorable terms under purchase orders with other suppliers. Stated conversely, the plaintiff could not have enforced against defendant an obligation to purchase from plaintiff all propane required by defendant at its Fairfax plant during the 1973–1974 season.[7]

Therefore, it is concluded that defendant made no express or implied promise to purchase any propane from plaintiff during the 1973–1974 season. In the absence of such a promise, purchase order no. KC–33109 lacks the mutuality of obligations and consideration required for a binding requirements contract because defendant gave no consideration and incurred no legal detriment in exchange for the promise of plaintiff. The purchase order constituted merely an offer or invitation for orders which could be revoked by plaintiff at any time prior to acceptance by receipt of an order for a specific amount from defendant.

The letter from Ferrell to Ironsmith dated July 30, 1973 was an effective revocation of the offer in the form of an invitation for orders contained in purchase order no. KC–33109. Therefore, no contract regarding the price of the propane delivered on December 31, 1973 and January 2 and 3, 1974 existed between plaintiff and defendant prior to the order to deliver.

Because no contract existed, it is unnecessary to consider what effect, if any, the change in market conditions in 1973 and the enactment of the Propane Allocation Program had on purchase order no. KC–33109.

(2) Price in Absence of Prior Contract.

Plaintiff and defendant had not discussed the price of the propane delivered December 31, 1973 and January 2 and 3, 1974, prior to delivery. Because both parties clearly intended to conclude a contract for sale of the propane, the price is "a reasonable price at the time for delivery." Section 84–2–305(1)(a), K.S.A.[8]

Plaintiff bases its invoice price of $0.4048 per gallon on a weighted cost of the propane to it of $0.35325 per gallon, a cost of transportation from Kearney, Missouri to the Fairfax plant of $0.0062 per gallon, and a profit to plaintiff of $0.04535 per gallon. Defendant does not contend that this price is unreasonable.

Therefore, judgment will be entered in favor of plaintiff for $18,276.62, plus statutory interest at the rate of six percent per annum from January 28, 1974, the date payment was originally due. *See* Section 16–201, K.S.A.[9]

---

**7.** Defendant cites *City of Louisville v. Rockwell Manufacturing Company,* 482 F.2d 159 (6th Cir. 1973) in support of its contention that a promise by defendant to purchase up to 500,000 gallons of propane exclusively from plaintiff can be implied. In that case, the Sixth Circuit Court of Appeals held that an agreement between Rockwell and the City of Louisville, which obligated Rockwell "to furnish part of the City's requirements of parking meters, coin boxes and repair parts . . . AP-PROXIMATELY: 7650 Parking Meters and Coin Boxes . . .", constituted an enforceable requirements contract for the City's requirements up to 7650 parking meters in light of the commercial context of the agreement. That case is distinguishable from this because there was no prior course of dealing which suggested that the practice of the City was to contemporaneously enter into several such contracts for the same period of time as did defendant in this case.

**8.** Section 84–2–305(1)(a), K.S.A. provides:
(1) The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if
(a) nothing is said as to price.

**9.** Prejudgment interest is allowable under Section 16–201, K.S.A., despite plaintiff's failure to include a prayer for prejudgment interest in the complaint.

For the foregoing reasons,[10] it is therefore

ORDERED and ADJUDGED that all relief prayed for in the counterclaim of the defendant be, and it is hereby, denied. It is further

ORDERED and ADJUDGED that plaintiff Propane Industrial, Inc., have and recover of and from defendant General Motors Corporation the sum of $18,276.62, plus statutory interest at the rate of six percent per annum from January 28, 1974, plus its costs herein expended.

---

10. After preparation of a draft of these findings of fact and conclusions of law, the parties were given an opportunity to show cause why judgment should not be entered in accordance with the findings and conclusions. Defendant's primary contention is that the prior course of dealing between plaintiff and defendant compels the conclusion that defendant intended to bind itself to purchase its requirements of propane up to 500,000 gallons exclusively from plaintiff. Defendants' factual and legal contentions have been fully considered. It is concluded that they do not justify alteration or amendment of the findings and conclusions reached herein.