UNIVERSAL POWER SYSTEMS, INC., Appellee,

v.

GODFATHER'S PIZZA, INC., Appellant. (Two Cases)

UNIVERSAL POWER SYSTEMS, INC., Appellant,

v.

GODFATHER'S PIZZA, INC., Appellee. (Two Cases)

Nos. 86–1972, 86–2032.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 12, 1987.

Decided May 13, 1987.

Rehearing Denied June 19, 1987.

Jeffrey Shaw, St. Paul, Minn., for appellant.

John Lewis, Springfield, Mo., for appellee.

Before ROSS, BOWMAN, and MAGILL, Circuit Judges.

MAGILL, Circuit Judge.

Godfather's Pizza, Inc. ("Godfather's") appeals from a final judgment entered by the district court upon a jury verdict in favor of Universal Power Systems, Inc. ("Universal") on a pizza pan oral "requirements" contract. For reversal, Godfather's argues that the district court erred in (1) finding that a contract existed as a matter of law, (2) admitting and excluding certain evidence, and (3) holding that the jury's award of damages was supported by the evidence. Universal cross-appeals from the district court's denial of its claim for pre-judgment interest. For the reasons discussed below, we affirm on the issues of contractual liability and pre-judgment interest, and remand the case for a new trial solely on the issue of damages, unless Universal consents to a remittitur.

## I. BACKGROUND.

Godfather's is a Nebraska corporation, whose principal business is the operation of pizza restaurants through a franchise system. Universal is a Missouri sales corporation engaged in the business of supplying pizza pans and accessories to various pizza companies such as Pizza Hut, Domino's Pizza and Godfather's.

Before 1983, Godfather's sold only one type of pizza—original "thin crust" pizza. From 1980 to 1983, Universal was the sole supplier of Godfather's original thin crust pizza pans, based on an oral agreement.

In early 1983, Godfather's employed a consulting firm to study the feasibility of expanding its product line to include "deep dish" pizza. Universal learned of the study, and discussed with the consulting

firm and Godfather's its willingness to participate in the project.

On July 6, 1983, Godfather's contacted Universal at its Springfield, Missouri office and requested a meeting in Omaha, Nebraska to be held the next day.

The meeting of July 7, 1983, lies at the heart of this dispute. Plaintiff's characterization of the meeting is as follows: The meeting was held in a conference room at defendant's corporate offices in Omaha. Bob Theisen, Tony Taylor and Mike DuChateau were present for Godfather's. At this time, Bob Theisen was Godfather's executive in charge of procuring pizza pans. Mr. Douglas Power and Mr. Gene Rutledge were present for plaintiff. The parties discussed the details of a possible "national rollout" of deep dish pizza. The logistics of such an undertaking were discussed including prices, quantities, and the development of acceptable dies for the manufacture of pans. It appeared that Godfather's needed three items which Universal Power could supply: (1) the pizza pan itself; (2) a collar, which fits around the top edge of each pizza pan and facilitates the cooking of the dough during the precooking stage; and (3) a separator, which allows the pans to be stacked one on top of the other. After a lengthy discussion Bob Theisen stated that Willy Theisen, the president of the company, had asked if Universal Power would be able to supply their needs. Mr. Power and Mr. Rutledge responded affirmatively. At that point, Mr. Theisen sat back in his chair and stated, "We need not go any further, we've found our supplier." Mr. Power and Mr. Rutledge stated that it was agreed at the meeting that Universal Power would supply all pans for the test markets. After testing, Godfather's would make a decision as to whether or not deep dish pizza would be incorporated into all the stores in the Godfather's chain. If so, plaintiff would supply the pans. However, both parties understood that Godfather's could not force its independent franchisees to purchase pans from the plaintiff. Accordingly, the contract was contingent upon two factors: (1) final approval of the deep dish pizza concept; and (2) acceptance of plaintiff's wares by the noncompany owned stores. [At this time, Godfather's had approximately 660 restaurants, one-third of which were company stores and two-thirds of which were owned and operated by independent franchisees.]

Defendant's version of the meeting is essentially the same with respect to many of the details. However, Bob Theisen contended that the agreement reached at the July 7 meeting was only that Universal Power would supply pans for the test markets and not that Universal Power would supply all of defendant's requirements of pans. *Universal Power Systems, Inc. v. Godfather's Pizza, Inc.*, Nos. 84-3248, 3249-CV-S-4, slip op. at 3-4 (W.D.Mo. July 16, 1986) (unpublished opinion).

After the meeting, Universal began to develop the tool and die work for production of the deep dish pans. Because of financing needs, Power asked Godfather's to send him a letter setting forth the parties' intentions so he could have something in writing to present to a bank loan officer. Bob Theisen wrote the letter, dated July 14, 1983, which was admitted into evidence at trial and which provides in relevant part:

Dear Doug [Power],

This letter is to confirm Godfather's Pizza, Inc.'s intention to purchase the following products:

1. Godfather's pizza dish—14 inch
2. Godfather's pizza dish—12 inch
3. Godfather's pizza dish—10 inch

We are also looking at prototype samples of spatulas and service trays submitted by Universal Power Systems, Inc.

Godfather's Pizza plans to use the pizza dishes in all company units providing the concept of pan pizza reaches final approval. Additionally, price competitiveness and consumer acceptability will be monitored. The above products can be made available for purchase by all franchise holders of Godfather's Pizza.

Sincerely,

Robert W. Theisen, Director
Franchise Services

Subsequently, there was a change in ownership and operation at Godfather's; on August 10, 1983, Godfather's purchased Hockenbergs, Inc., a restaurant supply corporation, and on September 6, 1983, Diversified Foods, Inc., a Pillsbury Company subsidiary, purchased Godfather's and instituted new management therein. This new management developed a new policy regarding purchases of pans and supplies, which required manufacturers to deliver their pans to Hockenbergs rather than to the franchisees. The new system also required competitive bids on contracts to supply Godfather's.

Universal was informed of the above changes sometime in October of 1983. By that time, Universal had already supplied 30 to 35 stores with its new equipment, and had received an order to supply 75 stores in the test market—35 stores by November 15, 1983, and 40 stores by December 15, 1983. Also around this time, Bob Theisen told Universal representatives that the new owners wanted bids on the pans, collars and separators. According to Universal, however, Theisen stated that it was just a formality. No bid forms were sent to Universal, and Universal did not submit any bids.

On November 9, Thomas Schrack, Hockenbergs' president, called Universal and told it that the contract for the national roll out of deep dish pizza pans had been awarded to Chicago Metallic Products. Godfather's issued a purchase order, dated November 8, 1983, to Chicago Metallic for $1,675,626.48 worth of goods for the national rollout.

By letter dated November 11, 1983, Universal informed Godfather's that it objected to the Chicago Metallic contract based on the agreement reached at the July 7, 1983 meeting in Omaha. Universal also stated that it would continue to supply the 75 test stores, which it did, but that it had not waived any rights under its contract with Godfather's. Although Universal did not sell any more deep dish supplies to Godfather's, it did sell approximately $400,-000 worth of the pans, collars, and separators to independent franchisees.

Subsequently, Godfather's was unable to complete its contract with Chicago Metallic, and only $911,927.35 worth of pans, collars and separators were actually delivered and paid for under the contract. Nevertheless, Godfather's paid Chicago Metallic an additional $411,816.65, in settlement of an apparent breach of contract claim.

Universal subsequently filed this diversity breach of contract action in federal district court, seeking lost profit damages in the amount of $579,000 based on a 31.4% "direct" profit percentage of Chicago Metallic's $1.6 million purchase order. It theorized that the order represented Godfather's requirements for the national rollout, and had Godfather's not breached its contract with Universal, Universal would have gotten the order. Universal also sought pre-judgment interest.

Following a three-day trial, the jury returned a verdict in favor of Universal, awarding it $400,000 in damages. After trial, the district court ruled on and denied Universal's motion for pre-judgment interest. The court also denied Godfather's alternative motions for j.n.o.v., a new trial, or a remittitur of damages. This appeal followed.

## II. DISCUSSION.

### A. Existence of a Requirements Contract.

Godfather's concedes that requirements contracts are valid and enforceable under Missouri law, see Mo.Ann.Stat. § 400.2–306(1) (Vernon 1965), the governing law in this diversity case. Godfather's claims, however, that the alleged oral requirements contract was so lacking in its material terms that the court should have deemed the contract invalid for indefiniteness as a matter of law and granted its motion for judgment notwithstanding the verdict. Additionally, Godfather's notes that the July 14, 1983 letter allegedly memorializing the contract did not state that Universal was to be its exclusive supplier, but merely represented Godfather's "intention" to use Universal as "a" supplier for its deep dish

needs. Godfather's thus asserts that "exclusivity", an essential prerequisite to a valid requirements contract, is missing in this case.

In reviewing the district court's denial of Godfather's motions for a directed verdict and for j.n.o.v.,

> we consider the evidence in the light most favorable to [Universal], assume as true all facts that [Universal's] evidence tended to prove, and give [Universal] the benefit of all favorable inferences. We [will] not overrule the District Court if the evidence [is] susceptible of any reasonable inference sustaining [Universal's] position. *See Crues v. KFC Corp.,* 729 F.2d 1145, 1148 (8th Cir.1984).

*Williams v. Ryder/P.I.E. Nationwide, Inc.,* 786 F.2d 854, 857 (8th Cir.1986).

■ In its opinion, the district court addressed Godfather's claim that the contract must fail for indefiniteness, specifically discussing each allegedly missing term. The court concluded that under Missouri law, substantial evidence supported Universal's contention that a requirements contract existed. We agree that the evidence, viewed most favorably to Universal, supports this conclusion.

■ Moreover, although the July 14, 1983 letter did not expressly state that Universal was to be Godfather's "exclusive" supplier, the letter uses the words "confirm" and "intention," indicating that Godfather's recognized that a contract had been reached between the parties. Further, even if the instant contract was somewhat ambiguous as to exclusivity, the uncontroverted prior course of dealings between Universal and Godfather's showed that Universal had been Godfather's sole and exclusive supplier of thin crust pans for three and one-half years. This evidence clearly distinguishes the case at bar from *Propane Industrial, Inc. v. General Motors Corp.,* 429 F.Supp. 214 (W.D.Mo.1977), upon which Godfather's relies to support its claim that the contract herein must fail for lack of exclusivity.[1]

In summary, we believe the evidence, when viewed most favorably to Universal, established the existence of an oral requirements contract. We therefore hold that the district court did not err in denying Godfather's motions for a directed verdict and for judgment notwithstanding the verdict.

**B. Admission of the $1.6 Million Purchase Order.**

Godfather's argues that the district court erred in admitting Chicago Metallic's $1.6 million purchase order into evidence,[2] and that this error requires us to reverse the district court's denial of its motion for a new trial.

A new trial may be granted when evidence has been improperly admitted or excluded only when the error has affected the substantial rights of the parties. Fed.R. Civ.P. 61; 11 C. Wright & A. Miller, Federal Practice and Procedure §§ 2882, 2883, 2885 (1973). The district court's denial of a new trial motion is reviewed under the abuse of discretion standard. *See Central Microfilm Service Corp. v. Basic/Four Corp.,* 688 F.2d 1206, 1213–14 (8th Cir. 1982), *cert. denied,* 459 U.S. 1204, 103 S.Ct. 1191, 75 L.Ed.2d 436 (1983).

---

1. In *Propane,* the court ruled that the alleged propane requirements contract was not enforceable because there was no evidence of any express or implied promise which would have bound the defendant to buy its propane requirements exclusively from the plaintiff. *Propane,* 429 F.Supp. at 220–21. In so ruling, the court found that the parties' contract was ambiguous as to exclusivity, and thus focused on the parties' prior course of dealings, which showed that the defendant had previously ordered and received its propane requirements not solely from the plaintiff, but also from other companies. *Id.* at 220. In contrast, we believe that even the *Propane* court would have recognized that the prior course of dealing evidence in the case at bar supports the conclusion that Godfather's, at the least, impliedly promised to purchase its deep dish requirements exclusively from Universal. *See id.* at 221 n. 7.

2. Although Godfather's also argues that the district court erred in excluding certain impeachment evidence concerning one of Universal's principals, we find this claim meritless, and believe that the court did not abuse its discretion in refusing to admit the evidence under Fed. Rules Evid.Rule 403.

The district court held that the purchase order was relevant to Universal's damages because the jury could have concluded that had Godfather's not breached its contract with Universal, Universal would have obtained an order for the same amount of goods as on the purchase order. The court, however, failed to keep in mind that Universal's contract with Godfather's was a "requirements" contract, and that under this type of agreement, damages are calculated by looking "to [Godfather's pizza pan] *purchases* from any other source during some relevant and comparable time period as a method of establishing [Godfather's] *good-faith requirements* under the [Universal] contract." *City of Louisville v. Rockwell Manufacturing Co.,* 482 F.2d 159, 166 (6th Cir.1973) (emphasis added). The purchase order, however, did not represent Godfather's *actual* purchases or good-faith requirements during the relevant period; it merely represented Godfather's *possible* requirements. *See* Mo.Ann. Stat. § 400.2–306(1) (quantity under requirements contract is measured by *actual* output or requirements).

■ By admitting the purchase order into evidence and by refusing Godfather's tendered jury instruction which would have limited Universal's damage base to $911,927.35, the stipulated-to amount of goods paid for and actually distributed by Chicago Metallic, we believe that the district court committed prejudicial error; it is clear that the jury's $400,000 damage award was based on the erroneous $1.6 million figure. *See* 11 C. Wright & A. Miller, *supra,* § 2885, at 289–90 (if evidence is insufficient to support jury verdict without the erroneously admitted evidence, the error is prejudicial).[3] Because this error does not affect the issue of liability, the district court did not abuse its discretion in denying an entire new trial. This error, however, does require a new trial solely on

the issue of damages, unless Universal consents to a remittitur, an issue we later discuss more fully.

## C. Damages.

The jury awarded Universal $400,000 in damages for Godfather's breach. If the jury's verdict is supported by substantial evidence, viewed in the light most favorable to Universal, it must be upheld. *E.g., Wilmington v. J.I. Case Co.,* 793 F.2d 909, 914 (8th Cir.1986).

Godfather's argues that the district court erred in not granting its motion for a new trial, or in the alternative, a remittitur of damages, based on its assertion that the $400,000 verdict is greater than the maximum amount supported by the evidence. It contends that the highest base for Universal's damages was $911,927.35, the stipulated-to amount of goods actually supplied by Chicago Metallic, and that when multiplied by the profit margin calculated by Universal's accountant, 31.4%, the maximum award of damages that the evidence supports is approximately $287,000. Godfather's further asserts that the 31.4% profit margin is erroneous because Universal's accountant failed to account for certain direct expenses attributable to production of the deep dish supplies. Godfather's maintains that if the accountant had done so, the correct profit margin would have been 9.97%, and therefore, that the maximum damages awardable would be $911,000 × 9.97%, or $91,000. We discuss these contentions separately.

### 1. Damage Base.

Although the district court felt that substantial evidence supported the jury's award of damages, in that the jury could properly base its calculation on Chicago Metallic's $1.6 million purchase order, we have already discussed the fact that the order was irrelevant to Universal's dam-

---

**3.** If the jury had based its award of damages on the $911,000 figure, the maximum amount of damages it could have awarded would have been approximately $287,000, i.e., $911,000 multiplied by 31.4%, the highest profit margin offered into evidence at trial. As the district court recognized, however, the size of the jury's ver-

dict indicates that the jury began with the $1.6 million·figure, multiplied it by the 31.4% profit margin, and then reduced that figure by the profits Universal already received on its post-breach sales to Godfather's independent franchisees.

ages under its requirements contract. *See* Part B, *supra.* Only the amount *actually* required by Godfather's during the period in question—the $911,000 worth of goods supplied by Chicago Metallic, and the $400,-000 worth of goods supplied by Universal post-breach—is relevant to Universal's damages. Because Universal already received its profits on the $400,000 worth of goods, however, it is not entitled to double recovery on this amount.

Nevertheless, Universal contends that the jury's damage award can be sustained on another basis. It maintains that if the $911,000 figure is applicable, so also should be the additional $411,000 Godfather's paid Chicago Metallic in settlement of the guaranty agreement between those parties, i.e., had Godfather's not breached the contract, it may have ordered $1.6 million worth of goods from Universal, and would have paid Universal a similar amount for not fulfilling the purchase order. Universal notes that the total damage base would be $1.3 million, which, when multiplied by the 31.4% profit margin, still supports the jury's verdict of $400,000.

Godfather's payment to Chicago Metallic, however, is irrelevant to Universal's damages. That payment was not made under a "requirements" contract, but under a "firm" contract, i.e., a purchase order for a specific amount of goods. In contrast, Universal had a requirements contract, under which if not breached, Godfather's would have ordered only the amount of goods it needed. Obviously, any guaranty payment based on Chicago Metallic's "firm" order is therefore irrelevant to Universal's damages under its requirements contract.

■ In summary, we conclude that the proper damage base for Universal's lost profits consists solely of the amount of goods Godfather's would have required from Universal had it not breached the contract, which is represented by the amount of $911,927.35, the goods actually paid for and supplied by Chicago Metallic.

### 2. Profit Margin.

Godfather's argues that Universal's accountant failed to subtract three items of overhead in computing its profit margin: warehouse expense, depreciation on the deep dish equipment, and salary increases resulting from the increased sales. Godfather's maintains that these costs were directly attributable to Universal's production of the deep dish supplies, and if accounted for, would reduce Universal's profit margin to 9.97%, as testified to by Godfather's accountant.

Because this is a sale of goods case, lost profits are governed by Missouri's version of U.C.C. § 2–708:

> (2) If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (*including reasonable overhead*) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this article (section 400.2–710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

Mo.Ann.Stat. § 400.2–708(2) (Vernon 1965) (emphasis added).

The Missouri Court of Appeals recently interpreted the "reasonable overhead" language of section 400.2–708(2) as including fixed overhead costs but not variable overhead costs. *Scullin Steel Co. v. Paccar, Inc.,* 708 S.W.2d 756, 763 (Mo.App.1986) (citing *Teradyne, Inc. v. Teledyne Industries, Inc.,* 676 F.2d 865, 869–70 (1st Cir. 1982)). Fixed overhead costs are those costs incurred regardless of the volume of output, such as rent, taxes and administrative salaries. *Great Western Sugar Co. v. Mrs. Allison's Cookie Co.,* 563 F.Supp. 430, 433 (E.D.Mo.1983). Variable overhead costs, also called "direct" costs, consist of those expenses directly tied to the volume of output, and these costs must be subtracted from the lost profit calculation under section 400.2–708(2). *Id.* at 434; *accord Automated Medical Laboratories, Inc. v. Armour Pharmaceutical Co.,* 629 F.2d 1118, 1125–26 (5th Cir.1980).

In calculating the lost profit margin of 31.4%, Universal's accountant testified that he subtracted all variable overhead, or "di-

rect" costs involved in producing the product from the sales price. Upon cross-examination, he testified that he did not subtract the three disputed items of overhead because he felt they were not costs involved in producing the product. As to the warehouse expense, he stated that it was recorded in Universal's books as rent, and further noted that Universal's products were manufactured outside and shipped direct to the customer, although he did admit having seen some pans stacked in the warehouse. He also testified that he subtracted out certain labor costs as direct costs attributable to the product, but did not subtract out the increase in salaries of Universal principals Rutledge and Power. Godfather's accountant, although testifying to his profit margin calculation of 9.97%, did not testify specifically as to any of the three disputed items of overhead.

■ Keeping in mind our standard of review, we believe that substantial evidence supports the inclusion of the three disputed expenses in the lost profit calculation as amounts of reasonable overhead, and thus, that the evidence supports that part of the jury's verdict based on the 31.4% profit margin. First, generally accepted accounting principles permit depreciation to be classified as a fixed overhead cost, see C. Horngren, Cost Accounting—A Managerial Emphasis 27–28 (4th ed. 1977), because this expense is not tied to the volume of a producer's output. Thus, despite the fact that Universal purchased new equipment for the Godfather's contract, it is clear that depreciation on this equipment need not have been subtracted in Universal's lost profit calculation. Second, if the jury believed the testimony of Universal's accountant regarding warehouse expense, then it could have determined that the expense was either rent, or a cost not tied to the volume of Universal's output. Under

either scenario, the jury could have concluded that Universal's warehouse expense was a fixed overhead cost. Finally, although it is generally true that salaries in a sales organization increase as sales increase, the specific testimony regarding increased salaries concerned only Universal's principals, who are executives of the company. It is well-settled under accounting principles, however, that administrative or executive salaries are fixed overhead costs. *Id.* at 22; *see Great Western*, 563 F.Supp. at 433. Therefore, because substantial evidence, viewed in the light most favorable to Universal and in view of the applicable law, supports classification of all three items as fixed overhead costs, we believe the evidence amply supports that part of the jury's verdict based on the 31.4% profit margin.

### 3. Summary of Damages.

In this case, the jury awarded Universal $400,000. The applicable law, however, permits the maximum amount of damages under Universal's requirements contract to be based solely on the profits of Godfather's actual requirements during the relevant period, less credit for profits already received, which in this case is $286,345.19.[4] Accordingly, we agree with Godfather's that the district court erred in not granting its motion for a new trial on the issue of damages, or in the alternative, its motion for remittitur.

This court may order a new trial conditioned on the plaintiff's acceptance of a remittitur. *Everett v. S.H. Parks and Associates, Inc.*, 697 F.2d 250, 253 (8th Cir. 1983) (citing 11 C. Wright & A. Miller, *supra*, § 2820, at 133–34). "Where the discrepancy between the award and the maximum amount reasonably supported by the evidence is apparent and the correction basically mechanical, and where the award

4. Godfather's actual requirements during the relevant period are represented not only by the goods supplied by Chicago Metallic, but also by Universal's post-breach sales. Because Universal was paid for those goods, the profits on them must be subtracted from the lost profit calculation. Thus, the profits on Godfather's actual requirements (31.4% × [$911,927.35 + $400,000]) less profits already received by Universal (31.4% × $400,000) results in the $286,345.19 figure.

is not the result of passion or prejudice, [footnote omitted] the correction can be made at the appellate level." *Id.* (citations omitted). We therefore vacate the judgment of the district court and remand the case for a new trial solely on the issue of damages, unless Universal agrees to a remittitur to the amount of $286,345.19.

### D.  Pre-Judgment Interest.

■  Universal renews its claim for pre-judgment interest, contending that it is entitled to receive this sum under Mo.Rev. Stat. § 408.020.  In *Scullin Steel,* however, the Missouri Court of Appeals stated:

> We are bound by the decision in *Wiggins* [*Ferry Co. v. Chicago & Atlas Railroad,* 128 Mo. 224, 27 S.W. 568 (1894)] where the court said, " . . . we think it has not been the practice in the state, whatever else it may be elsewhere, to allow interest on damages where the measure of damages is lost profits." 27 S.W. at 574. Mo. Const. Article V, § 2; *Keener v. Berry,* 442 S.W.2d 159, 162 (Mo.App. 1969).

*Scullin Steel Co. v. Paccar, Inc.,* 708 S.W.2d 756, 766 (Mo.App.1986).  Accordingly, whatever the law may be in other states, *Scullin Steel* makes clear that in Missouri, pre-judgment interest is unavailable where, as here, damages are based on lost profits.

## III.  CONCLUSION.

Based on the foregoing analysis, we affirm the district court's denial of Godfather's motion for j.n.o.v. on the issue of the existence of a requirements contract, and also affirm the court's denial of Universal's claim for pre-judgment interest.  Additionally, if within fifteen days from the date on which the mandate is issued and filed in the district court, Universal files a consent to remittitur in accordance with this opinion, the judgment as remitted will stand affirmed.  If Universal does not consent to a remittitur, the judgment will be vacated as to damages for a new trial solely on the damages issue.